# DECISIONS

## OF THE

# Court of Appeals of Kentucky

## FALL TERM, 1915.

### Neptune Fire Engine & Hose Company v. Board of Education of Mason County.

(Decided October 5, 1915.)

## Appeal from Mason Circuit Court.

1. Charities—Public Trusts and Charities.—Public trusts and charities under the law of England, did not owe their origin to the statute of 43 Elizabeth (A. D. 1601); that statute had only the effect to regulate the jurisdiction already possessed by the High Court of Chancery, and to define more distinctly the classes or objects which were deemed to be charitable.

2. Charities.—In addition to the uses set forth in the preamble to the statute of 43 Elizabeth, many other objects have been held to be charitable, because they were analogous to those mentioned in the statute, and were considered to be in conformity with the spirit of the preamble; and, although not within the strict letter of the statute, they have been held to fall within its equity.

3. Charities—Gift for Charitable Uses—Definition.—Whatever is given for the love of God, or for the love of your neighbor, in the catholic and universal sense—given from these motives and to these ends—free from the stain or taint of every consideration that is personal, private, or selfish, is a gift for charitable uses.

4. Charities—Gift for Charitable Uses—Validity.—Under Section 317 of the Kentucky Statutes, a gift for any of the charitable or religious purposes therein specified, or for any other charitable or humane purpose, is valid, if the gift point out, with reasonable certainty, the purposes of the charity and the beneficiary thereof.

5. Charities—When Volunteer Fire Company Not Public Charity.—
A volunteer incorporated fire company, having no capital stock,
and having no public duties imposed upon it by its charter, is
not a public charity; and, upon its voluntary dissolution, its
property, acquired by purchase, does not vest in the county court
for the benefit of the common schools of the county under Sec-
tion 323 of the Kentucky Statutes, relating to "Charitable Uses
and Religious Societies."

6. Corporations—Property of Dissolved Corporation—How Disposed
of.—Under the ancient common law, property of a dissolved cor-
poration was disposed of as follows: (1) Realty reverted to the
grantor, or his heirs; (2) Personalty vested in the sovereign;
and (3) Debts due to the corporation were totally extinguished.
But the common law rule no longer obtains, except in a few
particular instances.

7. Corporations—Property of Dissolved Corporation—How Disposed
of.—Under the modern doctrine, the real property of a dissolved
business corporation does not revert to the grantor, and the per-
sonalty does not escheat to the Commonwealth; but both species
of property vest in a receiver or other trustee, to be administered
by him for the benefit of the dissolved corporation's creditors and
shareholders.

8. Corporations—Dissolved Volunteer Fire Company—Assets of.—
Upon the dissolution of an incorporated volunteer fire company,
having no capital stock and having no public burdens imposed
upon it, its assets belong to the surviving members of the cor-
poration.

A. D. COLE for appellant.

W. H. REES and WORTHINGTON, COCHRAN & BROWNING
for appellees.

OPINION OF THE COURT BY CHIEF JUSTICE MILLER.—
Reversing.

The question for decision in this case is, whether the
land of the Neptune Fire Engine & Hose Co. No. 2, of
Maysville, Ky., upon the dissolution of that corporation,
should, (1) revert to the grantor of the land, or (2) go to
the Board of Education of Mason County, or (3) be dis-
tributed among the living members of the corporation.

The appellant was incorporated by an Act of the Gen-
eral Assembly, approved March 24th, 1851, which reads
as follows :

"An Act to incorporate the Neptune Fire Engine &
Hose Co., of Maysville."

"Sec. 1. Be it enacted by the General Assembly of
the Commonwealth of Kentucky, That Richard C. Davis,

Wm. W. Pike, Thomas N. Ross, David N. Biggers, John Hunt, Jr., Robert C. White and Wm. D. Hixon and their associates are hereby created a body politic and corporate by the name and style of the Neptune fire engine & hose company, No. 2, of Maysville, Kentucky, and, as such, shall have perpetual succession, and may be capable, in law, of contracting and be contracted with, suing and being sued, pleading and impleading, in any action or suit in any court whatever; and may have and use a common seal, and change the same at pleasure.

"Sec. 2.   They shall have the right to purchase, take, and hold one or more engines, hose carriage and hose, and all the necessary apparatus and tools for the use and repair of the same; to sell and convey, and purchase other engines, etc.   They may purchase and hold, in the city of Maysville, as much ground as will be required for a convenient engine house, and a place to transact their business, the value of the same not to exceed Ten Thousand Dollars, which amount of property they shall be entitled to hold.

"Sec. 3.   The management of the said property and company shall be under the direction of a president, vice-president, three engineers, and three directors chosen at such time and place as the by-laws of the company may direct; and they may have a secretary and treasurer, and keep a record of their proceedings.

"Sec. 4..  The members of this company, not to exceed three hundred, active and honorary, shall be exempted from militia duty, except in time of war, and from service on all juries and venires.   The secretary of said company on or before the first of February in each year, shall furnish the sheriff and circuit court clerk with a list of members, active and honorary, of said company: Provided, that those members of the company who are honorary members, and not engaged in the active duties of the company, shall not be released from serving on juries, but shall only be exempted from military duty."   Acts 1850-51, vol. 2, p. 660.

An amendatory act, approved April 24th, 1884, changed section 4 of the charter by adding the word "life" after the word "active" wherever it occurs in that section; by striking out the word "provided," and all that follows it in said section; and by adding an additional section empowering two-thirds of the active members of the company to borrow not exceeding $5,000.00

for the purpose of repairing the company's property or rebuilding its hall, with power to issue bonds therefor secured by a mortgage upon the real property of the company.

Pursuant to the authority granted, the corporation bought a lot fronting 40 feet on the north side of Third Street, in Maysville, on March 18th, 1862, from John B. and James P. Poyntz, trustees, for the sum of $575.00, taking the title to the corporation. This purchase price was contributed, in part, by members of the corporation, and the remainder of the purchase money was derived from the rents of said property.

Although the purpose of the corporation is not expressly stated in the charter, it is apparent that appellant was a volunteer fire company, organized for the purpose of extinguishing fires within the corporate limits of Maysville. The corporation erected a building upon its lot and equipped it with suitable fire apparatus; and, for many years it received compensation for its services from the city of Maysville. The company continued its activities along this line until the city of Maysville established a regular fire department of paid firemen.

The corporation continued in existence, however, until February 6th, 1912, when the 24 persisting members, by appropriate proceedings, dissolved the corporation and brought this action for a sale of the lot and its building, for the purpose of distributing the proceeds of sale between the persisting members.

In order that there might be no question concerning the title to the property, the plaintiffs made the Board of Education of Mason County, the Board of Education of the city of Maysville, the Commonwealth of Kentucky, and John Walsh, escheator, defendants to the action.

By consent of all the parties, the property was sold under a judgment of the court, which reserved the rights of all the parties to the proceeds of sale for future determination. The property sold for $7,000.00; and that fund, which now stands in lieu of the property, is the subject of this litigation.

It was claimed by the Board of Education of the city of Maysville, and by the Board of Education of Mason County, under section 323 of the Kentucky Statutes, which reads as follows:

"If any society holding lands shall dissolve, the title to such land and appurtenances shall vest in the trustees

of the county seminary in which the land may lie, for the use of such seminary; and if there be no such seminary, then in the county court, for the benefit of common schools in the county. The provisions of this chapter shall not apply to the society called Shakers, who shall have the same right to acquire and hold real estate as they have had prior to the passage of this law.''

But, as there was no county seminary in Mason County, the Board of Education of Mason County asked that the fund be turned over to the county court of Mason County to be held in trust for the common schools of the county.

The chancellor adjudged that the $7,000.00 derived from the sale of the real estate as above stated, less $146.35 necessary to pay a street claim, should pass to and be held by the county court of Mason County for the benefit of the common schools of that county, by virtue of section 323 of the Kentucky Statutes, above quoted. From that judgment the corporation and its members prosecute this appeal.

The chancellor rested his judgment upon the idea that the Neptune Fire Engine & Hose Company was not a private corporation, but was organized and created for a public or charitable use, and, upon its dissolution, the disposition of its property was controlled by section 323 of the Statutes, *supra*, which is a part of chapter 17 of the Kentucky Statutes, dealing with ''Charitable Uses and Religious Societies.'' The statute is only an extension of the equitable doctrine that a charity corporation is but a trustee for the public, and to give its assets to its members would be a perversion of the trust.

Appellants concede that if this volunteer fire company was a public charity, the devolution of its assets is controlled by section 323, *supra;* but they insist that the Neptune Company was a private corporation and that the disposition of its assets is governed by the law applicable to private corporations.

What, then, was the character of the Neptune Fire Engine & Hose Company?

Looking to the charter of the company to ascertain its purpose and character, it will be seen that it was given the power usually granted to ordinary private corporations, to buy and sell real and personal property, to contract, to sue and be sued, and to have and use a common seal and change it at pleasure.

No public or other duty was imposed upon it; it had no capital stock; and its property was not acquired by gift, but by purchase.

The management of the property of the corporation was placed under the direction of its officers selected by the members of the corporation. The second section of the amendatory Act of 1884 emphasized the business character of the corporation, as follows:

"Two-thirds of the active members of the said company may borrow money not to exceed $5,000.00 for the purpose of repairing their property or rebuilding their hall, and may issue bonds bearing six per cent. or less, or borrow the money on notes, in either case giving a mortgage upon the real property of the company." Acts 1883-4, vol. 2, p. 568.

It will readily be seen that the judgment of the chancellor disposing of the corporate property as directed by the statute, can be upheld only upon the idea that the appellant company was a public trust, or charity, and not a private corporation.

So, the question at last is, what is a public charitable institution, and does the Neptune Fire Engine & Hose Company come within the meaning of that term?

Until the decision in Vidal v. Girard's Exrs., 2 How., 194, by the United States Supreme Court in 1844, it was generally held that public trusts, or charities, owed their origin to the Statute of 43 Elizabeth (A. D. 1601.), and consequently, that no charity could be sustained unless it was embraced within the twenty-one specific classes enumerated in that statute.

That view had been expressed by the United States Supreme Court, speaking through Chief Justice Marshall, in Philadelphia Baptist Association v. Hart, 4 Wheat., 1, decided in 1819. Notwithstanding this eminent authority, the view therein expressed was disavowed in the Girard will case, supra, which first announced the now generally accepted doctrine that the court of chancery had exercised jurisdiction over charities long before the Act of 43 Elizabeth was passed. The earlier English decisions, then first made accessible, established the fact that the Statute of 43 Elizabeth had only the effect to regulate a jurisdiction already possessed, and to define more distinctly the classes of objects which are charitable. Atty. Genl. v. Tancred, Ambl., 351; Buford v. Lanthall, 2 Atk., 551;

Atty. Genl. v. Middleton, 2 Ves. Sr., 327; Atty. Genl. v. Skinner's Co., 2 Russ., 407.

The existence of such a jurisdiction anterior to and independent of the Statute of 43 Elizabeth, is now generally admitted. Vidal v. Girard, 2 How., 194; Ould v. Washington Hospital, 95 U. S., 303, overruling Philadelphia Baptist Association v. Hart, 4 Wheat., 1; Kain v. Gibboney, 101 U. S., 362; Burbank v. Whitney, 24 Pick., 153; Preachers' Aid Society v. Rich, 45 Maine, 559; Derby v. Derby, 4 R. I., 436; Landie v. Wooden, 1 Ohio St., 160; First Baptist Church v. Robberson, 71 Mo., 326; State v. Smith, 16 Lea., 662; Williams v. Pearson, 38 Ala., 299; LaGrange County v. Rogers, 55 Ind., 297; Dodge v. Williams, 40 Wisc., 91; Shotwell v. Mott, 2 Sandf. Ch., 46; Atty. Genl. v. Jolly, 1 Rich. Ed., 99, 42 Am. Dec., 349; Goodale v. Mooney, 60 N. H., 528, 49 Am. Rep., 334; Hinckley's Estate, 58 Cala., 457; Beall v. Fox, 4 Ga., 404; Hoeffer v. Colgan, 171 Ills., 462, 40 L. R. A., 730, 63 Am. St. Rep., 241; Miller v. Chittenden, 2 Ia., 315; Gass v. Wilhite, 2 Dana., 170, 26 Am. Dec., 446; 6 Cyc., 899.

In Maryland, Michigan, Minnesota, New York, North Carolina, Virginia, West Virginia and Wisconsin, a marked divergence is found, chiefly as the result of local statutes. 14 L. R. A. (N. S.), 58; 6 Cyc., 901.

While the Statute of 43 Elizabeth is not to be regarded as the orgin of charitable uses, it has, however, always been looked to as furnishing a definition of what uses are to be considered as charitable; although in those states in which the statute is not in force, the courts will not confine themselves to the objects enumerated in the statute. In addition to the uses set forth in the preamble to the Statute of 43 Elizabeth, many other objects have been held to be charitable, because they were analogous to those mentioned in the statute, and were considered to be in conformity with the spirit of the preamble. Although not within the strict letter of the statute, they have been held to fall within its equity.

Many attempts have been made to define a charity, but they have always resulted in a definition that is subject to criticism.

The now celebrated definition of a charity as formulated by Horace Binney in his argument in the Girard will case (2 How., 194), and approved by this court in Ford v. Ford, 91 Ky., 575, reads as follows:

"Whatever is given for the love of God, or for the love of your neighbor, in the catholic and universal sense, —given from these motives and to these ends—free from the stain or taint of every consideration that is personal, private, or selfish, is a gift for charitable uses."

This definition was severely criticised by Judge Paxson of the Supreme Court of Pennsylvania, in Fire Insurance Patrol v. Boyd, 120 Pa. St., 624, 1 L. R. A., 417, 6 Am. St. Rep., 745, upon the ground that it tested the nature and character of the institution by the motives of the donor, and not by the purposes of the institution.

Judge Paxson said:

"Is the Insurance Patrol a public charitable institution? The learned court below held that it was not, upon the ground that the main object of the institution was to benefit the insurance companies, who were the chief contributors to its funds. In other words, the learned judge tested the nature and character of the institution by the motives of its contributors. We might be driven to the same conclusion were we to adopt Mr. Binney's definition, as found in his argument in the Girard will case, as the test of a public charity, where he said: 'It is whatever is given for the love of God, or for the love of your neighbor, in the catholic and universal sense—given from these motives, and to those ends, free from the stain or taint of every consideration that is personal, private, or selfish.' This is undoubtedly charity in its highest and noblest sense; the Recording Angel might well point to it with satisfaction; and it may be the text in the great hereafter; but were we to apply it to the transactions of this wicked world, I fear it would lead to serious embarrassment. In the first place, it is utterly impracticable, for it is God only who can look into the heart and judge of motives. In the second place, if we had the power of omniscience and were to apply it, what would be the result? How many of our noblest and most useful public charities would stand such a test? How many donations to public charities are made out of pure love to God and love to man, free from the stain or taint of every consideration that is personal, private, or selfish? Who can say that the millionaire who founds a hospital or endows a college, and carves his name thereon in imperishable marble, does so from love to God and love to his fellow, free from the stain of selfishness? Yet, is the hospital or the college any the less a public charity

because the primary object of the founder or donor may have been to gratify his vanity, and hand down to posterity a name which otherwise would have perished with his millions? There is ostentation in giving as well as in the other transactions of life. In some instances donations to public charities may be in part due to this cause; in others there may be the expectation of indirect pecuniary gain or return. The professional man who gives freely to his church may not be insensible to the fact that liberality makes friends and sometimes increases clientage. Coiled up within many a gift to a public charity there is a secret motive, known only to the Searcher of all hearts. It may be to benefit the donor in this world or to save his soul in the next. It would be as vain as it would be unprofitable for a human tribunal to speculate upon the motives of men in such cases. Nor is it necessary for any legal purpose. The money which is selfishly given to public charity does as much good as that which is contributed from a higher motive, and in a legal sense the donor must have equal credit therefor. We must look elsewhere for a definition of a legal public charity.''

In Morrice v. Bishop of Durham, 9 Ves., 405, Sir William Grant, one of the greatest of English equity judges, said that those purposes are considered charitable which are enumerated in the Statute of 43 Elizabeth, or which, by analogy, are deemed within its spirit and intendment; but it was justly remarked in Jackson v. Phillips, 14 Allen, 555, that this definition leaves something to be desired in point of certainty, and suggests no principle.

Mr. Justice Gray, when on the Supreme Bench of Massachusetts, defined a charity in its legal sense as a gift to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their minds or their hearts under the influence of education or religion, by relieving their bodies from disease, suffering, or constraint, by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government. Jackson v. Phillips, 14 Allen, 555. It is immaterial whether the purpose is called charitable in the gift itself, if it is so described as to show that it is charitable in its nature. Jackson v. Phillips, *supra.*

While this last definition is perhaps not as concise as could be desired, it is nevertheless both clear and compre-

hensive, and is adopted by Perry in his work on Trusts as the most satisfactory definition of a charitable use; and, it has lately been approved by the Supreme Court of Pennsylvania in Fire Insurance Patrol v. Boyd, *supra,* where the distinction between the motive and the purpose of the gift is pointed out, and the purpose declared to be the true test.

Without confining themselves to any one definition, but looking at the subject in its broadest significance, text-writers have generally classified charitable gifts as follows: (1) gifts for eleemosynary purposes; (2) gifts for educational purposes; (3) gifts for religious purposes; and (4) gifts for public purposes. Bispham's Principles of Equity, sec. 120.

It is clear this case must be brought within the fourth class as a gift for public purposes, or it must be denied the character of a charity. Under the head of gifts for public purposes, Bispham enumerates the following:

"4. Gifts for erecting or maintaining public buildings or works, or otherwise lessening the burdens of government; and under this head may be comprehended all trusts for the building or repair of bridges, ports, causeways, sea-banks, for paving, cleansing and lighting a town, for erecting town houses, laying out and maintaining public parks, for supporting military organizations, and bequests of a like character." Sec. 123.

And in the same section he further says:

"It may be remarked here, that when the subject of the trust is not the result of a gift, but of a contract or a statute, the use will not be a charitable one, for charity is necessarily based upon the idea of bounty, and cannot be predicated of an agreement to devote money to a benevolent object, or of an assessment under a statute."

It will be noticed that the definitions of Mr. Binney and Justice Gray conform to Bispham's text, in the respect that each of them bases his definition of a charity upon the idea of a gift.

But we have in Kentucky a statutory definition of a public charity, which is controlling in so far as it is applicable.

Section 317 of the Kentucky Statutes is a substantial re-enactment, in general terms, of the Statute of 43 Elizabeth; and while it, by its terms, declares that gifts in aid of charity or religion shall be valid, if the instrument creating them shall point out with reasonable certainty

the purpose of the charity and the beneficiaries thereof, it specifies the purposes which constitute a charity.

It reads as follows:

"All grants, conveyances, devices, gifts, appointments and assignments heretofore made, or which shall be hereafter made, in due form of law, of any lands, tenements, rents, annuities, profits, hereditaments, goods, chattels, money, stock, or choses in action, for the relief or benefit of aged or impotent and poor people, sick and maimed soldiers and mariners, schools of learning, seminaries, colleges, universities, navigation, bridges, ports, havens, causeways, public highways, churches, houses of correction, hospitals, asylums, idiots, lunatics, deaf and dumb persons, the blind, or in aid of young tradesmen, orphans, or for the redemption of prisoners or captives, setting out of soldiers, *or for any other charitable or humane purpose,* shall be valid, if the grant, conveyance, device, gift, appointment, or assignment shall point out, with reasonable certainty, the purposes of the charity and the beneficiaries thereof, except as hereinafter restricted."

A volunteer fire company not being included among the specified charitable purposes, it must be treated as a humane purpose, and the deed which creates it must point out with reasonable certainty the humane purpose of the charity and the beneficiaries thereof; otherwise it is not a charity.

The statute tests the nature and character of the institution by its purpose, and is, for that reason, not subject to Judge Paxson's criticism above quoted. By specifying the many kinds of charities enumerated in the Statute of 43 Elizabeth, and in placing them in juxtaposition with "any *other* charitable or humane purpose," it made the humane purpose the basis of all valid charities in this State. And, while our statute does not require that the subject of the trust should be the result of a gift, it is a matter of common knowledge that charities are generally so created.

Indeed, the distinctive characteristics of a public charity are that its funds are derived from gifts and devises and not from fees, dues, and assessments, and that it is not confined to privileged individuals, but is open to the indefinite public. City of Bangor v. Rising Virtue Lodge, 73 Me., 428; Hopkins v. Crossley, 138 Mich., 565.

Turning to the legislative charter of the Neptune Fire Engine & Hose Company to determine the character

of that corporation, and applying Binney's definition above given to the provisions of the charter for the purpose of determining whether its purposes are humane, it will be seen that they bear little or no resemblance to a charity.

The charter merely gives the right to buy and sell one or more engines and hose carriage and hose, and the further limited right to purchase and hold as much ground as may be required for an engine house and "a place to transact their business."

It recites no gift of any kind, and declares no purpose, humane or otherwise, for its creation.

It does not recite what the "business" of the corporation shall be, or that it shall transact any business, unless it be by implication. It is an elementary rule of construction that primary corporate powers are not to be implied. And, what is more significant, the charter contains no provision exempting the property from taxation. On the contrary, for many years the city paid the corporation for its services, presumably by contract, and it disposed of its income from all sources as it pleased.

It is true that in the great case of Sarah Zane's Will (Magill v. Brown, Brightly, N. P., 346, 14 Haz. Reg. Pa., 305, Fed. Cas. No. 8,952), Justice Baldwin, upon the circuit, in 1833, held a bequest of $1,000.00 to the citizens of Winchester, Va., "to purchase a fire-engine and hose to be kept in best repair" was a valid charity; but that case is easily distinguishable from the case at bar.

In the Sarah Zane case the fund was created (1) by gift, (2) to the citizens generally of Winchester, and (3) for a specific public purpose. None of these characteristics appear in the case at bar, since there is no gift to anybody or any public purpose imposed upon the owners of the property.

In Humane Fire Company's Appeal, 88 Pa., 389, and again in Fire Insurance Patrol v. Boyd, *supra,* the Supreme Court of Pennsylvania held a volunteer fire company was a public charitable institution; but in each case the court rested its decision upon the fact that the funds had been contributed for charitable purposes, and not furnished by the members of the organization, as in the case at bar.

The legal status and relation of a corporation of the character of the Neptune Fire Engine & Hose Co. to the public, is well shown in the opinion of this court in the

recent case of Louisville Ry. Co. v. Louisville Fire & Life Protective Association, 151 Ky., 644, 43 L. R. A. (N. S.), 600.

The appellee in that case was a private corporation, created by an act of the legislature, and owned and conducted by the fire insurance companies of Louisville for the purpose of maintaining a salvage corps for the protection of property at. and after fires; and by the 12th clause of its charter its men were given the right of way through the streets of the city while getting to a fire. In going to a fire the association's automobile collided with a street car which had failed to give the automobile the right of way, whereupon the association sued the street railway company for damages for the injury to the automobile, resting its claim to the right of way as against the street car upon the fact that it performed a public service.

In denying the claim, the court said:

"From this expression of our views it will be seen that the question comes down to the proposition—does this association perform public service in the meaning of the Constitution? We think it does not. We do not find in the act creating this corporation any suggestion of public control or the imposition of any duty owing to the public. Its servants and employes are. not and cannot be required by any public authority to attend fires or do anything for the protection of life or property. When they do attend they go as the agents and representatives of the insurance companies and to further their interests. No penalty is fixed for the failure of the employes of the association to attend fires, and no state, city or other public official or authority has the right to control, or direct, or interfere with the management of its affairs.

"It is as free from the control of public agents as any other distinctly private corporation could be. It is doubtless true, as may be freely conceded, that the employes of the association, when they attend fires in the interest of and for the benefit of the insurance companies, also perform a public service in protecting and saving life and property and in preventing the spread of fire; but the service so rendered to the public is merely incident to and a part of the business they are engaged in as agents of the insurance companies. What is. done for the benefit of the public and in the interest of the public good is primarily done for and in the interest of the private con-

cerns they are employed by. The public service rendered by this association is not the character of public service contemplated by the Constitution, nor does it entitle the persons who render it to be set apart as the beneficiaries of special privileges.

"The public service that may entitle certain individuals, including private corporations, to privileges and immunities not enjoyed by the public generally, is a public service that carries with it some measure of public control and supervision, and the right of public control and authority must precede or accompany the grant of the privilege, and be so much a part of it that the privilege cannot be exercised without incurring the responsibility and liability that attaches to the performance of public duties. In short the beneficiary of every grant of special privileges must be in some degree the servant of the public and subject to the control and authority of some public agency."

The fact that the Neptune Fire Engine & Hose Co., for many years, received compensation for its services, from the city of Maysville, tends to show that it was a private corporation, and contracted for its services like any private corporation, rather than to show it was a public charity.

We conclude, therefore, that the Neptune Fire Engine & Hose Co. was not a public charity.

2. This question yet remains for determination: The Neptune Fire Engine & Hose Co. having been dissolved, who are entitled to its property?

Under the ancient common law, according to Lord Coke, property of a dissolved corporation was disposed of as follows: (1) realty reverted to the grantor, or his heirs; (2) personalty, like the *bona vacantia* of the Roman law—having no owner—vested in the sovereign; and (3) debts due to the corporation were totally extinguished because there was no creditor who could accept payment. Co. Litt., 13b. But the common law rule no longer obtains, except in a few particular instances.

Under the modern doctrine the real property of a dissolved business corporation does not revert to the grantor, and the personalty does not escheat to the Commonwealth; but both species of property vest in a receiver or other trustee, to be administered, by him, for the benefit of the dissolved corporation's creditors and shareholders. 10 Cyc., 1327; 5 Thomp. on Corp. (2nd Ed.),

Sec. 6551; 7 R. C. L., Sec. 748. The rule is equally applicable to non-stock corporations. Huber v. Martin, 127 Wis., 412; 7 A. & E. Ann. Cas., 406; 115 Am. St. Rep., 1023, 3 L. R. A. (N. S.), 653.

In Huber v. Martin, *supra,* the court said:

"We are cited to the supposed ancient rule of the common law that, upon the termination of a corporation, its real estate reverts to the grantor and its personalty to the sovereign, and that its debts become extinguished. Some bearing is claimed for that. While it has some distinguished support in modern times (Kent Com. 13th Ed., 307), it long since became obsolete, if it ever was the law, except as regards public corporations. It was. distinctly repudiated by this court in Lindemann v. Rusk, 104 N. W., 119, 124. The authorities supporting such repudiation are substantially without conflict. Church of Jesus Christ of L. D. S. v. United States, 136 U. S., 1, 47, 34 L. Ed., 481, 492, 10 Sup. Ct. Rep., 792; Purdy's Beach, Priv. Corp., Sec. 1327; Cook, Corp., 5th Ed., Sec. 641; Morawetz Priv. Corp., 2nd Ed., Sec. 1032; 5 Thomp. Corp., Sec. 6746. American courts have, except in a very few instances, never recognized the doctrine, and quite recently it was held by the court of Queen's Bench in bankruptcy that it never had any place in the common law of England. In re Higginson (1899), 1 Q. B., 325, 79 L. T. N. S., 673, Wright, J., said that no instance was recorded in the books where such doctrine was ever applied by any English court, and referred to an American decision (Bank of Vincennes v. State, 1 Blackf., 267, 12 Am. Dec., 234), where the contrary was held, as having been reasoned on a false basis. We may safely close this branch of the case by saying that, aside from *dicta* here and there, in the whole not worthy of serious consideration, there is no legitimate support anywhere for the rule that the property of a business corporation, upon its termination and the payment of its debts, goes otherwise than to its members, if it has members to take. It is quite remarkable that the ancient rule should, for well-nigh two centuries, be confidently asserted from time to time by judges and text writers as the law, including writers of such eminence as Bacon, Kyd, and Kent, have first been repudiated quite unanimously in America, and then be declared, in the supposed place of its origin, to never have been a part of the common law. Here the language of Justice Bradley, in Church of Jesus Christ of L. D. S. v.

United States, 136 U. S., 1, 17, 34 L. Ed., 481, 484, 10 Sup. Ct. Rep., 792, confirming the application of the supposed ancient rule to public corporations, has been universally adopted.''

In McAlhaney v. Murray, 89 S. C., 440; 35 L. R. A. (N. S.), 896, the court held that the realty of an incorporated temperance society—treated as a benevolent and social corporation as distinguished from a business corporation—did not revert, upon its dissolution.

In Wilson v. Leary, 120 N. C., 90; 38 L. R. A., 240; 58 Am. St. Rep., 778, it was held that land conveyed in fee simple to an incorporated Odd Fellows' Lodge did not revert to the grantor, upon the dissolution of the corporation.

In the course of the opinion in that case, the court said:

''There are some broad and obvious lines of difference between trading or business corporations and eleemosynary corporations; but there is no such difference as makes reversion to the grantor of corporate real estate, on dissolution of the corporation, unjust and absurd in one case and fair and reasonable in the other. The difference that one kind of corporation issues shares of stock for the capital paid in, and is conducted for the purpose of making money for its shareholders, while the other receives and invests money in buildings and lands or other property for the special benefit of a class, or of the general public, and issues no stock, is no logical basis for holding that the rule of the common law has become obsolete and odious in one case, and not in the other. In rapidity of development, in variety of organization and of enterprise, the modern eleemosynary corporation has well nigh kept pace with the modern business corporation. In its development it has reached a point entirely out of the view and conception of jurists of Lord Coke's day. Incorporated hospitals, universities, colleges, churches, fraternal societies, and social clubs buy land, construct expensive buildings, and accumulate large endowments. The idea that upon the dissolution of such a corporation the land and buildings go to one who happened to be the person who conveyed the land to the corporation seems clearly as absurd and odious as it is antiquated.

''There is hardly any logical ground for rejecting the common-law rule of reversion, when considered with respect to business corporations, that does not apply with

equal force when considered with respect to eleemosynary corporations. Not only is the distinction artificial, but the attempt to apply it must lead to doubt and confusion on the bench, as well as at the bar, because of the practical difficulty of classification. There are many corporations, such as fraternal societies and other like organizations, which have both business and eleemosynary features. Such associations can be placed on one or the other side of the line between business and eleemosynary corporations only on refined distinctions about which, no doubt, courts would differ."

To the same effect, see Clark v. Chelsea Academy, 56 Vt., 734; Presbyterian Church v. Venable, 159 Ill., 215, 50 Am. St. Rep., 159.

Hopkins v. Crossley, 138 Mich., 561, is quite similar in its controlling facts to the case at bar. In that case the surviving members of the "Old Volunteer Fire Department of Detroit," incorporated in 1840, undertook in 1886, to sell its property, divided a large part of it between the members, and placed the residue amounting to about $20,000.00 in trust for charitable purposes. The trust was void because the doctrine of charitable uses did not exist in Michigan, and the fund was consequently treated, as in the case at bar, as the property of a dissolved non-charitable corporation.

The court said:

"In the present instance the fund was derived from members mainly. Whatever its source, it became the property of this corporation. Before its dissolution, it attempted to dispose of it to certain charitable uses, but failed, whereby the legal title remained in the trustees. No one claims that the trustees should hold for their own benefit. Had not the corporation been dissolved, we cannot doubt that it could recover the fund, and devote it to its own purposes, as provided in section 6 of its own organic act. But it was dissolved, and the attempt of its surviving members to reclaim the fund (to which the trustee has no just claim) is met by denial upon the ground that they have no claim upon it, for the reason that it had escheated to the State.

"An escheat must rest upon the fact that, the trust failing, there is no one lawfully entitled to the fund. It is true that the corporation no longer exists, but its members and their representatives remain. The doctrine that upon the dissolution of a corporation its real estate

reverts, and its personal property goes to the crown, is a hard doctrine that courts of equity have power to relieve against, and we think that such a rule is not generally applied in this country to corporations in which the members had a pecuniary interest. See Tinkham v. Borst, 31 Barb., 411; Bacon v. Robertson, 18 How., 480; Broughton v. Pensacola, 93 U. S., 269; Towar v. Hale, 46 Barb., 361; 10 Cyc., 1327; 9 Am. & Eng. Enc. Law (2nd Ed.), 608.

"Our examination of the authorities leads us to the opinion that the doctrine of the common law, odious at home, and reluctantly followed in this country, in some instances had a doubtful origin, and, as said in 2 Kent's Commentaries, 307, note b, should be considered obsolete. It is a new question in this State, and we feel justified in denying its application here. Statutes implying legislative disapproval of it, and providing against its consequences by authorizing the winding up of the affairs of defendant corporations, were early passed, and are of wide application. We feel justified in saying, therefore, that the fund in the hands of the trustees remained in equity the property of the corporation, and upon its dissolution its existing members succeeded to its rights. They and their representatives are entitled to have this fund divided between them. The persons entitled to share in this fund are those recognized as members at the time of dissolution who are now living, and the personal representatives of such members as have since died."

Mason v. Atlanta Fire Company No. 1, 70 Ga., 604; 48 Am. Rep., 585, is strikingly like the case at bar, except that there the property was acquired chiefly by donations, while here it was acquired by purchase, and it is, consequently, a stronger case for the company. In the Mason case the appellee, a volunteer fire company in Atlanta, was incorporated by the legislature in 1850; and having been superseded by a paid fire department in 1882, the company was dissolved, and its personal property converted into cash with the view of distributing it among the living members of the company. The company's realty, worth over $10,000.00, remained undisposed of.

There, as here, the members of the fire company were exempted from jury service, and also from militia duty, except in case of war.

Mrs. Mason, the widow of the most active and prominent of the originators of the company, claimed the right of participating in the fund, and brought her action to enforce it.

The court denied Mrs. Mason's claim, holding that the surviving members of the corporation owned the property, and that neither the state nor Mrs. Mason had any right to any part of it.

Likewise, in Bacon v. Robertson, 18 How., 480, Mr. Justice Campbell, in speaking for the court, said:

"The acquisitions of real property by trading corporations are commonly made upon a bargain and sale, for a full consideration, and without conditions in the deed, and no conditions are implied in law in reference to such conveyances. The vendor has no interest in the appropriation of the property to any specific object, nor any reversion where the succession fails."

See also People v. President & Trustees of College of California, 38 Cal., 173.

Hughes v. Miller, 164 Ky., 449, is instructive, and bears upon the question under discussion.

The doctrine above announced is not inconsistent with the decisions of this court in Taylor v. Rogers, 130 Ky., 124, and Stanford College v. Lincoln County Board of Education, 145 Ky., 842, as will be readily seen from reading the final page of the last named case, where the distinction between the cases is pointed out.

From the foregoing authorities it results that the property of the Neptune Fire Engine & Hose Co., upon its dissolution, belonged to the surviving members of that corporation, and that the circuit court erred in adjudging it to the Mason County Court for common school purposes.

Judgment reversed with instructions to the circuit court to enter a judgment in accordance with this opinion.