## Greene et al. v. Stevenson et al.

Nov. 16, 1943.

833

Vest & Vest and H. K. Northcutt for appellants.

D. L. Pendleton, V. W. Bush and S. T. Davis for appellees.

OPINION OF THE COURT BY VAN SANT, COMMISSIONER—Affirming.

Rex Oil & Gas Company was incorporated May 19, 1917, with a capital stock of $20,000, which was later in-

834

creased to $100,000, $79,665 of which was paid in. Since its organization it has paid to stockholders in dividends over $1,000,000. The life of the corporation was 20 years; wherefore, the charter expired midnight, May 18, 1937. Apparently the expiration date slipped the minds of the directors and stockholders, and the corporation continued to do business until April, 1941, when the directors discovered that they were operating without a charter. Upon this discovery, several of the stockholders, who had been directors in the company, prepared an agreement, which recites:

"Agreement by Stockholders of
Rex Oil & Gas Company
and
Subscription to Stock of the
Rex Oil & Gas Company

"Whereas, under the terms of its original charter Rex Oil and Gas Company, a Kentucky corporation, for many years engaged in oil and gas business, cannot continue to conduct its general business under said charter because of the limitation of time provided therein, and whereas, its stockholders desire that said business which has been successfully conducted for many years be continued, and for that purpose desire that a charter be procured for a new Kentucky corporation to be known as The Rex Oil & Gas Company, with power to continue in business for fifty (50) years, and which new corporation shall have in general the same powers as to the nature of business, control and management thereof as were had by said original corporation, and which new corporation is being formed by J. M. Stevenson, L. C. Young, S. T. Davis, V. W. Bush, Joe S. Lindsay, R. M. Scobee and Thomas J. Stevenson, the persons constituting the present Directors of said original corporation, and the authorized stock of which new corporation shall be the same One Hundred Thousand Dollars ($100,000.00), as that of said original corporation, the par value of said shares of said new corporation being Ten Dollars ($10.00) each, the same as the par value of the shares of said original corporation, and it being contemplated that the stock to be issued of said new corporation to the subscribers, shall be to each in the same number of shares as each holds in said original corporation.

"Said stock so subscribed in said new corporation to be fully paid up by the transfer by the original corpora-

tion by its Officers and Directors to the new corporation on behalf of each of the signers hereto of his or her proportionate share of all assets and liabilities of said original corporation, so that upon this agreement being signed by all of the stockholders of the original corporation, the new corporation will hold all assets and assume all liabilities of said original corporation, and the stock of said new corporation will be held share for share in the same amounts as was the stock of said original corporation.

"The signers hereof therefore now subscribe each for the number of shares set opposite his or her name in the stock of said The Rex Oil & Gas Company, and authorize the above named persons now constituting the existing Board of Directors of said original corporation to consummate the incorporation of said new company. The stock so subscribed shall be paid in full by said original corporation by its Officers and Directors transferring to said new corporation the share of each of the signers in the assets and liabilities of said original corporation.

"We waive holding of organization meeting of stockholders of said new corporation, and direct that in the articles of incorporation of said new corporation, the first Board of Directors shall set out as the same persons who are now Directors as above named, who shall hold office until the next regular annual meeting to be held in January of each year as provided in said articles.

"Witness our signatures this April ———, 1941."

It appears that all of the stockholders signed the agreement except appellant, Mrs. W. B. Lindsay, who allegedly was the owner of five shares of the corporate stock. Among those who signed the agreement was Mrs. Elizabeth Lindsay Greene, whose name was affixed July 29, 1941. On August 8, 1941, she dispatched the following letter:

"To Rex Oil & Gas Company

"John M. Stephenson, President and its Board of Directors

"Gentlemen:

"On or about the last of July or first of August, just past, at the instance of my brother, J. S. Lindsay, Winchester, Kentucky, a member of your Board of Directors,

I signed, as a stockholder in said company, a writing presented to me by him, the purpose of which, as represented to me by said brother, being to extend the charter of the Rex Oil & Gas Company, in which I hold 132 shares of capital stock, subject to my assignment of same as collateral for a loan from the Kentucky State Bank of Carrollton, Kentucky, of which assignment you had notice as shown by a letter addressed to the Kentucky State Bank of Carrollton, Kentucky, by your president, John M. Stephenson, acknowledging said assignment.

"I find that the writing I signed was evidently a writing signifying the intention of the stockholders who signed same to go along in an effort to form a new company to take over all the assets of the Rex Oil & Gas Company. I signed said writing relying upon the statement of my brother, J. S. Lindsay, that its purpose was to extend the charter, subsequently, I found that under the law the Rex Oil & Gas Company does not now exist save for liquidation purposes, its charter having expired some four years ago. I am also informed that all moneys paid by the Rex Oil & Gas Company and all acts done not in furtherance of liquidation are void acts and such moneys so expended are recoverable for the benefit of the stockholders. Had I known that the purpose of having me sign the paper was organize a new company, I would have refused, for I do not want to prolong the life of the company. I have long been dissatisfied with the manner in which the company was conducted, that is practically as a closed concern, precluding the stock having any real market value as it should have. As it is, the only value the stock has is the $152.00 per year, whereas my brother informed me some years ago the company could liquidate and pay $60.00 per share to each stockholder. Therefore, I am heartily in favor of liquidating and positively opposed to organizing a new company, and permitting my interest in the old company to be merged into the new, and I now repudiate my signature to said writing. I am sending a copy of this repudiation to my brother, J. S. Lindsay, and one to the Secretary of State, noting of record with him my objection to the formation of a new company and my refusal to permit my interest to be used for purchase of stock in such new company. The law seems to be very plain and no number of stockholders can defeat the rights of any individual stockholder. In justice to myself and to the pledges of my stock, I could

not agree to any procedure other than liquidation of Rex Oil & Gas Company.

> "Yours truly,
> "Elizabeth L. Greene
> "Mrs. Frank C. Greene."

The new company was incorporated August 20, 1941. In article V the names and places of residence and numbers of shares of stock subscribed by each stockholder were set out, and the following provision recited, to-wit: "As to the stock set out above as subscribed by Mrs. Elizabeth L. Greene (Mrs. Frank C. Greene), it is stated that said Mrs. Greene after signing in due course subscription agreement for said stock in said new corporation, said stock to be paid for in the manner above set out, by the transfer of her interest in the old corporation to said new corporation in payment for said subscribed shares, and which subscription agreement was signed and delivered by her and was signed and delivered also by various other subscribers, attempted to withdraw her signature to said subscription, by notice to the President of said former corporation of her election to so withdraw her name. The said corporation and its paid President and said incorporators hereof do not recognize said withdrawal, or attempted withdrawal, as valid or effective. As to said stock so subscribed, however, it is expressly stated that if the said subscription of said Mrs. Greene should be held to be ineffective, so as to entitle her to any accounting as to the value of her stock held by said former corporation, then said new corporation assumes said liability to the same extent as the former corporation had such liability, if any."

Previous to the granting of the charter of the Rex Oil & Gas Company, this suit was instituted by Mrs. Greene against the officers and directors of Rex Oil & Gas Company (the corporation whose charter had expired) in their capacity as officers of the expired corporation, and individually, wherein she seeks an accounting of the receipts and disbursements of the company from the time its charter expired to the date of the filing of the petition. She further asked for an order directing the defendants immediately to take steps necessary to wind up the affairs of the corporation, and enjoining them "from committing or doing any other acts relating to the affairs of business of the said corporation in its

name, which are not in furtherance of winding up its affairs," and "such other further and different relief as to which she may appear entitled." She alleged that her signature to the agreement first herein recited had been obtained by fraud, perpetrated upon her by her brother, a former member of the board of directors. Evidence was taken and the case submitted to the Chancellor for judgment, which was entered dismissing her petition.

Previous to the submission of the case, Mrs. W. B. Lindsay was permitted to intervene. Her petition alleged that she was the owner of five shares of the corporate stock of the first corporation; that she had not signed the agreement to become a stockholder in the Rex Oil & Gas Company. She adopted the allegations of the petition of Mrs. Greene, and asked the same relief. A demurrer was sustained to the intervening petition, and judgment entered dismissing the intervening petition upon the intervenor's refusal to plead further. Mr. Lindsay joined his wife as a party to the petition.

Several grounds are urged for a reversal of the judgment. The first is, that the Court erred in adjudging that the signature of Mrs. Greene to the agreement to subscribe stock in the Rex Oil & Gas Company was obtained in good faith, and not through misrepresentation by Mrs. Greene's brother, Joe S. Lindsay. Mrs. Greene testified that Mr. Lindsay obtained her signature to the instrument at the home of her niece, who is Mr. Lindsay's daughter; that he produced the instrument and told her, "Here is a paper I want you to sign." At the time she was at the dinner table, and after finishing dinner she and Mr. Lindsay went into the living room. She stated that after she had "undertaken to read the paper," she asked him what it was about. He told her, "It is to extend the Rex Oil and Gas Company charter." She then departed from the subject, and complained to him because she had not received larger dividends from the company. She testified that he told her, "You are the last one to sign this," and that she felt that if she were the last to sign, it did not make any difference whether she signed or not. She further stated that he failed to tell her that the charter of the old corporation had expired, nor did he advise her in respect to the status of a corporation whose charter had expired. That he did not tell her that by signing the paper she was sub-

scribing for shares in a new corporation, or that she pledged her interest in the old company in payment of the shares to be issued her when the new company secured its charter. She testified further that he did not advise her as to the legal procedure necessary to effectuate the purpose the writing disclosed. Mr. Lindsay's daughter testified that she was present at the time, and substantially corroborated her aunt in the testimony recited above.

Accepting this testimony as true, when read in connection with the letter Mrs. Greene dispatched to the old corporation and its directors, we are of the opinion that it falls far short of the clear and convincing proof which one must establish to nullify his signature to a written instrument upon the ground of misrepresentation or fraud. Mrs. Greene had the paper she signed in her hand, read part of it, refused to read further, because, as she stated, she did not understand legal terms. We see nothing in the instrument she signed which would require one versed in legal terms to interpret its meaning. It clearly sets out the transaction she now complains of, and the evidence conduces to show that she freely and voluntarily signed the instrument, and her repudiation was inspired by her husband after the instrument was signed. The first intimation by Mrs. Greene that she had been induced to sign the agreement was contained in her letter of August 8. The misrepresentation she says was perpetrated upon her was the statement that the purpose of the writing was to extend the charter, whereas, she said that, had she known the purpose, she would have refused, because, as she said, "I do not want to prolong the life of the company." We fail to see how she could have been led into the belief that the life of the company would terminate by extending its charter. She complains in the letter that she had been dissatisfied for a long time with the manner in which the company was conducted. Certainly she was not misled on that occasion as to the manner in which it had been conducted, and if it was unsatisfactory to her, she knew it at the time she signed the instrument. Over a period of 24 years, the company paid dividends in excess of a million dollars, and in the four years it operated without a charter the dividends aggregated 50% of her investment; and, unless she had some peculiar information which is not disclosed by the pleadings or the evidence, we think it absurd for her to conclude that the

company was mismanaged. Clearly, the Chancellor did not err in finding that she voluntarily signed the stock subscription, and that she agreed it might be paid by cancellation of her subscription to the stock in the original corporation. But it is insisted that, since she withdrew her signature prior to the issuance of the charter for the new corporation, she cannot be held to her agreement. There seem to be two rules in respect to the right of a subscriber to stock to withdraw his subscription before incorporation of the company to whose stock he has subscribed. The majority rule, as stated in 61 A. L. R. 1464, is: "A subscription to stock in a corporation to be thereafter formed does not constitute a valid contract, but is a mere offer by the subscriber to the projected corporation, and is not binding upon the former until the corporation comes into existence."

The minority rule is stated in the same volume of the same work at page 1476, as follows: "It is stated in a number of cases that a subscription to stock in a contemplated corporation is binding upon the subscriber from the time of subscription and cannot be withdrawn or revoked by him, even before the corporation comes into existence, without the consent of the other subscribers."

So far as we can ascertain, it has never been necessary for this Court to determine which rule it considers to be the more sound, and we think it unnecessary in this case. There is an exception to the majority rule, which is expressed in 61 A. L. R. page 1474, as follows: "The doctrine permitting a subscriber to stock in a projected corporation to withdraw his subscription before the formation of the corporation does not, however, effect his liability upon, or give him the right to revoke, a contract supported by good consideration, containing mutual undertakings, merely because the contract may, as one of its several terms, provide for the formation of a corporation by the parties thereto."

The agreement under consideration in this case proposed other undertakings than mere subscriptions to stock in an unchartered corporation. It provided for a method of disposing of the assets of the original corporation in the manner calculated by subscribers to be for their best interest. Such mutual undertakings on the

part of the subscribers constitute a good consideration for the contract, and if the majority rule were to be adopted, the instant case would fall under the exception to the rule; whereas, the mere mutual assent of the subscribers would be a good consideration if the minority rule were adopted. That being true, appellant cannot complain unless, as is contended, the common law rule that, upon the expiration of the charter of a corporation, the stockholders become vested with the title to the property theretofore standing in the corporation's name, is still in force in this State. If this contention should be upheld, all of the assets of the old corporation could not be transferred to the new, unless the stockholders of the old corporation executed deeds, because some of the property consisted of real estate. Section 561, Carroll's Kentucky Statutes, reads:

"Any corporation organized under this chapter may, by the consent in writing of the owners of the majority of its shares of stock, unless otherwise provided in the articles of incorporation, or amendments thereto, close its business and wind up its affairs; and when any corporation expires by the terms of the articles of incorporation, or by the voluntary act of its stockholders, it may thereafter continue to act for the purpose of closing up its business, but for no other purpose; and it shall be the duty of the officers to settle up its affairs and business as speedily as possible;  *   *   *."

It will be noted that the statute above quoted does not set any specified time in which the officers and directors of a corporation must close up its affairs, nor does it provide for a peculiar manner of winding up the business. We see no reason why a complete sale of all of the assets of a corporation does not as completely close up the affairs and business as any other manner of liquidation. If the officers do not wind up the corporation as expeditiously as practicable, it may be that the stockholders have a cause of action for damages, if injury can be shown by reason of the delay. Nevertheless, the method they eventually select will not be disturbed unless it is shown that the method selected will effectuate a loss which would not otherwise have to be borne by the stockholders; and certainly one who has agreed to the method by which it may be closed will not be heard to complain, even in that eventuality. The purpose of statutes allowing extension of time to a dissolved cor-

poration for winding up its business is to provide for the administration of corporate property by the corporation itself during the period allowed, and· to permit the title to its property to remain in the corporation itself until it winds up its affairs. The effect of Section 561, supra, and all other statutory provisions for extension of time for the winding up of dissolved corporations, is to abrogate the common law rules relative to the reversion of corporate real estate, escheat of its personal property, and extinguishment of the debts owed by and to it. 13 Am. Juris. sec. 1365, p. 1206; 47 A. L. R. sec. 116d, page 1547; Hauger v. International Trading Co., 184 Ky. 794, 214 S. W. 438; and Castle's Adm'r v. Acrogen Coal Co. et al., 145 Ky. 591, 140 S. W. 1034, 1036, and cases therein cited. The cases of Neptune Fire Engine & Hose Co. v. Board of Education of Mason County, 166 Ky. 1, 178 S. W. 1138, Ann. Cas. 1917C, 789; Ewald Iron Co. v. Commonwealth, 140 Ky. 692, 131 S. W. 774; Young v. Fitch, 182 Ky. 29, 206 S. W. 29; Shadoin v. Sellars, 223 Ky. 751, 4 S. W. (2d) 717; and Kash v. Lewis et al., 224 Ky. 679, 6 S. W. (2d) 1098, seem to be at variance with this holding. But none of those cases took into consideration the purpose behind the enactment of Section 561, supra; and if they are subject to the interpretation that a defunct corporation does not have the authority under that Section of the Statutes to sell the assets, though they consist wholly or in part of real estate, without the stockholders and their spouses executing deeds therefor, they to that extent are overruled.

Finally, counsel argues that, although Mrs. Greene may be bound by the writing she signed, since Mrs: Lindsay did not sign it, she had the right to intervene and obtain the relief sought by Mrs. Greene in her petition and adopted by Mrs. Lindsay in her intervening petition. Undoubtedly, since Mrs. Lindsay did not agree to accept stock in the new corporation in lieu of the value of the liquidated assets of the old, she has the right, by proper proceeding, to have the value of her stock ascertained, and to be compensated therefor. But that does not extend to her the right to require the old corporation to be liquidated in a manner better suited to her notion of how it should be done. The sale of the assets of the old corporation to the new corporation was a liquidation, as effectively as if cash had been paid for the assets, and the new corporation, under proper pro--

ceeding, is liable to her for the value of her stock, having assumed such liability in its articles of incorporation. But such relief was not sought in this case, and the Court would have been without authority under the pleading presented to have entered judgment for the relief to which she is entitled. That being true, he did not err in sustaining the demurrer to her intervening petition.

The judgment is affirmed.

Whole Court sitting.