## Kash v. Lewis, et al.

(Decided May 22, 1928.)

### Appeal from Whitley Circuit Court.

1. Boundaries.—Where boundaries of 15-acre tract were determined under deed except as to fourth line of survey, which ran 100 feet beyond beginning point, location of property was determined by lopping off additional 100 feet on the fourth line of the survey rather than by shifting the property to conform to the extended line.

2. Boundaries.—In suit to determine title to lot between person in possession and others claiming title through conveyance of 15-acre tract, evidence held to show location of lot within the tract by reference to survey and arrangement of adjacent lots.

3. Adverse Possession.—Possession which will ripen into title at expiration of 15 years is something different from occasional trespass or occasional exercise of ownership of land, and mere payment of taxes for street improvements or use of ground as pasture is insufficient to constitute adverse possession.

4. Adverse Possession.—Possession which will ripen into title must be open, notorious, peaceable, and continuous, and must be such that owner of property could institute suit against person in possession at any time during limitation period.

5. Adverse Possession.—Abandonment of possession for any period of time, however brief, interrupts continuity of adverse possession, and in case of new entry upon the property, statute of limitations commences to run from the time of the break in possession.

6. Adverse Possession.—Purchaser of vacant lot claimed to have been inclosed by fence in part held not to acquire title by adverse possession, where fence was subsequently removed and no building was erected on lot until several years before commencement of action, and where nothing was done to show purchaser's adverse claim through open, notorious, peaceable, or continuous possession.

7. Champerty and Maintenance.—Setting up of hot dog stand on lot and use thereof, without showing that lot was inclosed and had been reduced to complete dominion of person erecting stand, did not constitute such possession of property such as would render purchase at judicial sale by person out of possession champertous.

8. Corporations.—Corporation does not cease to exist simply because its charter expires, but it has existence beyond life of its charter for purpose of winding up its affairs.

9. Judicial Sales.—Where stock corporation was purchased at judicial sale before expiration of its charter, but sale was not confirmed until after the charter expired, confirmation related back to date of purchase.

10. Corporations.—On dissolution of a business corporation its property vests in stockholders, subject to the payment of corporate liabilities.

11. Corporations.—Where stockholder became insolvent and stock was sold at judicial sale, which was confirmed after charter of corporation has expired, purchasers nevertheless became owners of the stock, and upon dissolution of the corporation title to the original stockholder's interest in the corporation passed to them.

12. Appeal and Error.—While Court of Appeals defers largely to the judgment of chancellor with regard to findings, the Court of Appeals may nevertheless exercise independent judgment as to whether findings of chancellor are supported where the proof is before it.

13. Quieting Title.—In suit involving title to lot to which persons out of possession claiming title sought to recover rental value of property, court's allowance of $1,100 for rents of property detained over period of several years was excessive, where evidence failed to show substantial rental value of the lot or damages caused by detention, though there was some proof that hot dog stand erected on lot rented for $5 a month and that clandestinely erected house had $25 per month rental value.

14. Quieting Title.—In suit to determine title to property, person in possession was not entitled to relief on ground of payment for certain street improvements assessed against the lot where reimbursement therefor was not sought in pleadings.

HENRY C. GILLIS for appellant.

STEPHENS & STEELY, WILLIAM LEWIS and J. D. TUGGLE for appellees.

OPINION OF THE COURT BY JUDGE LOGAN—Reversing.

This record is made up of two consolidated actions involving the title to the same property, that is, a lot 105 feet square on Depot street in the city of Corbin. The lot is substantially vacant although there is a small building on it known as the "Tin House" which appears to have been erected in 1919 under the authority of S. H. Kash, husband of appellant, Neeta Kash. There is also a small brick structure on the property clandestinely erected by D. T. Chestnut about 1921. It has rarely been our fortune, or misfortune, to examine a record which is so difficult to analyze. Maps, plats, and blue prints numbering several score are a part of the evidence. Learned surveyors have testified in great detail in an effort to locate to the satisfaction of a court the lot in controversy.

The appellant claims the lot in controversy under a paper title which in all respect appears regular. In addition, she claims title to the lot by adverse possession. The appellees, William Lewis, G. B. Angel, and J. N. Young, claim the lot under a paper title which appears in all respects regular.

In the latter part of 1921, S. H. Kash, who at the time claimed to be the owner of the lot in controversy, instituted a suit in equity against D. T. Chestnut, having for its object the quieting of his title to the lot, and, further, to enjoin alleged trespasses by Chestnut. Later the appellees, Lewis, Young, and Angel, instituted an action in ejectment against S. H. Kash, Neeta Kash, and D. T. Chestnut for the recovery of the lot and for $1,000 damages for its detention. The two suits were consolidated and prepared and tried in equity. S. H. Kash died before the end of the litigation, and his title passed to his wife, the appellant. D. T. Chestnut also died during the litigation, and the action was revived against his heirs. The claim of Chestnut and his heirs to the lot appears to have been abandoned, and the litigation was fought out

in the lower court between Lewis, Young, and Angel on the one side and Mrs. Neeta Kash on the other. The chancellor adjudged that Chestnut had no title to the disputed lot and that appellant had no title to the disputed lot, and further adjudged that Lewis, Young, and Angel were the owners of the lot in controversy, and awarded judgment for its possession and, further, for $1,100 in damages or rents for its detention.

J. C. Lay and W. S. Nicholson, the owners of the lot adjoining the lot adjudged to Lewis and his associates, were made parties to the action by cross-petition filed by the appellant. The cross-petition appears to have been filed with the idea in mind that the lot occupied by Lay and Nicholson might be the lot to which appellant had title. The cross-petition was dismissed, and Lay and Nicholson are named as appellees on this appeal. The controversy, if any, between them and the appellant, was not developed in the lower court, and an affirmance of the judgment as to them will be without prejudice to the rights of the parties.

A number of persons and corporations are mentioned in the record by the parties in the establishment of their chains of title, and in an effort to determine the location of the lot in controversy. Nelson R. Cummins was a farmer who owned a tract of land of 185 acres on Lynn Camp creek in Whitley county when the Louisville & Nashville Railroad Company built its first line from Lebanon to Jellico about the year 1880. All of the parties to this litigation claim title under deeds executed by Cummins. D. T. Chestnut was an extensive dealer in lands and town lots about the time the city of Corbin was founded. He owned at one time or another many of the lots in the city of Corbin. A. W. Francis was his son-in-law and associated with him in his land deals. About the year 1891 Chestnut and Francis, with A. Gatliff and Charles Finley, incorporated the Corbin Land Company for the purpose of buying and selling land and lots in the city of Corbin. Chestnut was the general manager of the corporation. The Gatliff & Chestnut Commercial Company was a business concern engaged in the operation of a general store and in dealing in timber. Its affairs were controlled by the stockholders of the Corbin Land Company. Francis was the managing agent of this concern. Vincent Boreing became interested in the development of Corbin and engaged in the buying and sell-

ing of lots and land in that vicinity. His brother-in-law, W. R. Ramsey, was an attorney who was associated with Boreing in his business in Corbin. C. W. Jones was another dealer in real estate associated with Boreing and Ramsey. The Corbin Town Company was a corporation organized by Boreing, Ramsey, and Jones in April, 1892, with a life of 25 years. Its life expired, therefore, in April, 1917. At the time of the expiration of the charter Boreing and Jones were dead, and their children and devisees took their estate. Ramsey at the time was alive and residing in Denver. In the year 1916 his creditors instituted suits against him in the Laurel circuit court for the collection of his debts. As the result of that litigation his interest in the Corbin Town Company was sold.

Corbin was built first on the east side of the railroad. The west side was low and marshy and unsuitable for cultivation. In October, 1887, Cummins sold several tracts of land to Boreing, Jones, and Ramsey, one of which was the tract mentioned in this record as the 15-acre tract, which, according to the claim of appellees, includes the lot in controversy. Cummins sold 7 half-acre lots on the west side of the railroad and 2 larger lots, making 10 separate sales revolving around this dispute. He also made some sales for railroad rights of way and depot grounds. The boundaries to the lots and land sold by Cummins are of importance in this suit, because it is from such boundaries that the proper location of the lot in controversy must be made.

There are numerous maps in the record each intended to illustrate or support the contention of the party introducing it. Many deeds are introduced, and all of them have more or less bearing on the matter in controversy. It appears to us that there is a surplusage of maps, deeds, and surveyors' reports in the record. There are maps made by the landowners in the beginning of the subdivision of the town site into lots, and which were at the time placed on record and sold by the Corbin Town Company and the Corbin Land Company. There are maps made by engineers and witnesses as well as railroad maps relating to rights of way and depot grounds in the city of Corbin.

The 15-acre tract which was conveyed to the vendors of appellees in 1887 was uncultivated woodland at the time of conveyance. Practically all of it is now im-

proved city property, and half of it or more is covered by substantial brick buildings. Cummins had sold 6 or 7 half-acre lots, but thereafter the Corbin Land Company, managed by Chestnut, acquired all of them and laid out streets through them. The half-acre lots were subdivided and sold off in lots of different sizes. It necessarily follows that there is no trace of the original lines called for in the deeds. A solution of the question depends upon the location of the lots sold by Cummins on the west side of the railroad and the proper location of the boundary of the 15-acre tract. Before Cummins sold the 15-acre tract to Boreing and his associates he had sold the land he owned on the west side of the railroad north of the 15-acre tract to James McHargue in 1885. In 1885 a black oak was marked in the line of the railroad right of way as McHargue's corner, but within a year or two thereafter the railroad made a pit there of considerable area and the tree was thereby destroyed. The deed to the 15-acre tract describes it as a lot above the pit. The first line of the 15-acre tract ended at a black oak in Horton Nunn's old line. Along this line the city is built up and the lots have been improved, but there is evidence along a portion of the line of an old fence separating the property sold by the different owners. There is a black stump on the hillside, and it appears to be admitted that it is the second corner in the 15-acre tract. The second line ended at a post oak corner originally, but the location of the post oak as established by the surveyors appears to be under a brick residence at this time, and its exact location could not be identified. The third line calls to end at a stake in a line of Kellar's lot. An examination of the maps, plats, and testimony indicates that at first there was some dispute as to whether the end of the third line actually ended in the west line of the Kellar lot, but as the case meandered through the court and the testimony accumulated, it appears that all parties finally agreed that the end of the third line in the 15-acre survey was at a point in the west line of the Kellar lot. We will return to the Kellar lot a little later. The fourth line of the 15-acre survey calls to run with Kellar's line a distance of 164 feet. The west line of the Kellar lot was only 99 feet in length, and the end of the third line of the 15-acre survey struck the Kellar lot at a point between the ends of the 99-foot line. In our opinion this whole unfortunate controversy grew out of the error, which is obvious, in calling the fourth line of the

15-acre survey a 164-foot line when in fact it should have been a 64-foot line. We find in the briefs that it is admitted by all parties that there is an error at this point.

It is needless to follow the other lines to the 15-acre survey in detail. But it is well established by all of the proof that if an attempt is made to superimpose the 164-foot line on a 99-foot line, that the last line of the 15-acre survey will extend exactly 100 feet beyond the first corner. If the fourth line of the 15-acre survey should end at the 64 feet it necessarily follows that appellees will have an additional 100 feet fronting on the railroad as the lines of the 15-acre survey after the third line reaches the west line of the Kellar lot run approximately north parallel with the railroad. The exact location of the north Coon lot or Wallace lot is the point which must be established in order to correctly determine the controversy. The disagreement between the parties to the controversy revolves around the sole question as to whether the north line of the Coon lot is 100 feet north or south of the point contended for by the respective parties. Appellees contend that it is 100 feet further south than appellant says it is, while appellant contends that it is 100 feet further north than appellees say it is. We use the exact figures, 100 feet, as that substantially expresses the disagreement between the parties. The north line of the Wallace or Coon lot runs north 75 east 209 feet. The question in dispute is the actual location of that line on the land. It is to be noted here, as further and corroborating evidence of the mistake in the fourth line of the 15-acre survey, that the sixth line of that survey calls to run with the west line of the Hill, McKeehan, and Coon lots a distance of 313½ feet, and this distance ends at the northwest corner of the Coon lot. That is the corner that we are searching for, as it is there that the line turns north 75 east and runs 209 poles. The surveyors testify that the sixth line of the 15-acre survey is 313½ feet, and that that is exactly the combined length of the west lines of the Hill, McKeehan, and Coon lots. If the fourth line should be extended 100 feet beyond the north end of the Kellar west line, the sixth line would extend 100 feet beyond the northwest corner of the Coon lot. And if that is the correct distance the line running north 75 east 209 feet would turn at a point 100 feet north of the point contended for by appellees. The question therefore is whether the northwest corner of the Coon lot is substan-

tially 477½ feet from the point where the end of the third line of the 15-acre survey strikes the Kellar lot, or whether it is substantially 377½ feet from that point. All of the evidence indicates that the fourth line of the 15-acre survey should be 64 feet instead of 164 feet. This is proven by the fact that the sixth line runs with the west line of the Hill, McKeehan, and Coon lots a distance of 313½ feet, which it could not do if it surrendered to the fourth line 100 feet of that distance. Another fact, as indicated above, is that the last line of the survey extends exactly 100 feet beyond the beginning corner.

Instead of attempting to work out a solution of this problem by assuming that the railroad company moved its depot, grounds, and rights of ways 100 feet south many years ago, it seems to us much more logical to lop off the 100 feet in the fourth line of the 15-acre survey, which is according to admitted legal principles and which will avoid the necessity of shifting the properties in that neighborhood 100 feet further south as is contended for by counsel for appellant. Since the law is so well established that courses and distances must give way to well known and established objects in making a survey, and since this principle is recognized and admitted by counsel for appellant, we will cite no authorities to justify our conclusion that it is impossible to lay down a line 164 feet long on a portion of a line only 99 feet long.

It is necessary, however, to locate the 7 lots sold by Cummins adjoining the railroad property, 6 of which were thereafter acquired by Chestnut. These 7 lots were half-acre lots. In addition to the 7 half-acre lots he sold 4 tracts of land in the vicinity of the 15-acre tract, the remainder of which is now claimed by appellees and included as one of the four. Immediately north of the 15-acre tract Cummins sold a tract to James McHargue in February, 1885. South of the 15-acre tract he sold a tract containing 9 or 10 acres to Gatliff & Chestnut Commercial Company in April, 1890. South of the last-mentioned tract he sold an 8-acre tract to Nancy Harrison in March, 1889. The Harrison tract included one of the half-acre lots bordering on the depot ground. One of the other lots bordering on the depot ground was sold to Gatliff & Chestnut Commercial Company in September, 1889. Another one was sold to Coon, which is known as the Coon south lot, in October, 1887. On the southeast corner of the 15-acre tract adjoining the railroad right of way

the remaining 4 of the 7 lots were sold by Cummins to Kellar, Hill, McKeehan, and Wallace. The last-mentioned was conveyed to Coon, and is known as the Coon north lot. According to the deeds, the Harrison lot was 108 feet wide, the Gatliff & Chestnut Commercial Company lot was 105 feet wide, the south Coon lot was 105 feet wide, the Kellar lot was 99 feet wide, the Hill lot was 104½ feet wide, the McKeehan lot was 104½ feet wide, and the Coon north lot was 105 feet wide.

In an effort to locate the north boundary of the north Coon lot it is necessary to find some fixed point which in its relation to these lots will enable us to locate the north line of the Coon lot as the location of that line settles the controversy. There is a half-acre tract within the Nancy Harrison tract above referred to which was conveyed by Cummins to J. H. Bishop on December 4, 1889. It appears to have been the first sale made by Cummins on the west side of the railroad. Bishop conveyed this same lot to J. Bolin. It borders on the depot ground and is 104½ feet wide and extends westward between parallel lines a distance of 209 feet. The 7 lots conveyed away by Cummins were not exactly of the same width, but substantially so. For instance, the Kellar lot is described as 6 poles wide and 13 poles in length, which makes it 99 feet by 214½ feet. Bolin owned the Bishop lot for a year or two, when he conveyed it to Governor James D. Black, of Barbourville. Governor Black, on June 7, 1889, conveyed it to the original grantor, Cummins, and recited in the deed which he executed that he had first sold the lot to Mary E. Reader by title bond and that she had sold it to Cummins with written directions to him to make the deed to Cummins. It is sometimes referred to in the record as the Bishop lot and at other times as the Reader lot, and still at other times as the Bolin lot. We shall refer to it as the Bishop lot, because on December 4, 1889, Cummins again sold the some lot to Bishop and described it as a half-acre lot and bounded on three sides by the Harrison land. In 1903 Bishop conveyed the lot to J. A. Adams, describing it as a lot 105 by 210 feet. In August, 1905, Adams conveyed the lot to John W. Nelson. Nelson organized an ice company, and since that date an ice factory has been located and in operation on that lot. It is still in its original form and size. A street was opened up along the railroad right of way to the ice plant lot, but the owners of this lot at the

time refused to grant the city any street. Third street has since been laid out to the south of it, and it is now a concrete, paved street. Railroad avenue, which is also of concrete construction, ends at the north side of the Bishop lot. The location of this lot is thus well established. The Gatliff & Chestnut Commercial Company lot, the Coon lot, the Kellar lot, the Hill lot, the MeKeehan lot, and the north Coon lot lie to the north of the Bishop lot and each one just north of the other in the order named. The combined west line of the lots mentioned is 731 feet in length. Running north from the north line of the Bishop lot 731 feet makes the line end at the point where appellees contend is the correct location of the northwest corner of the Coon north lot.

As stated above, Chestnut acquired these lots. Streets were laid off through them and he subdivided some of the lots and sold them. The record seems to disclose that Chestnut sold 25 feet to Brock, 80 feet to Logan, 105 feet to Saddler, 105 feet to Frost, 50 feet to Harp, 100 feet to Wyatt, 50 feet to Maynor, 10 feet to Samuels, 26 feet to Lay and others, and 100 feet to Doyle. The aggregate width of the lots which Chestnut sold after he acquired the lots which Cummins had sold is 651 feet, but he dedicated two 40-foot streets, which when added to the width of the lots brings the total footage up to 731.

It appears to be thus definitely determined that the north line of the Coon north lot is 731 feet from the north line of the Bishop ice plant lot. If that is true appellees are correct in their contention as to the location of the north line of the north Coon lot, and if they are correct in their contention, the lot now in controversy and which is claimed by appellant is within their 15-acre survey to which they have good title and has never been conveyed away by them. All agree that the lot claimed by Kash must be on the south side of the north line of the north Coon lot.

In January, 1890, Nelson Cummins executed a right of way deed to the Louisville & Nashville Railroad Company. This deed contains a statement that the north line of the Cummins farm was 675½ feet south of the north face of the coping of the south abutment of the Lynn Camp creek bridge. That abutment was erected in 1881 and is still there. By an examination of other deeds, rights of way, as well as plats and blue prints made by the railroad, and using the south abutment of Lynn Camp

creek bridge as a starting point, the north line of the north Coon lot can be located at exactly the point that it is located by beginning at the north line of the ice plant lot and running north 731 feet. The details of the calculation would extend this opinion without any good reasons therefor.

An examination of this voluminous record and the complicated testimony, both oral and written, has involved much tedious work, but it has left us without any substantial doubt as to the correct location of the lot in controversy. The appellees are the owners of the lot so far as the paper title is concerned.

But appellant insists that she is the owner of the lot by adverse possession. An examination of the evidence leads us to the conclusion that her claim of title based on adverse possession is without merit. There is very little proof in the record which tends to show that any one has ever had that character of possession of this lot which would ripen into a title. The husband of appellant purchased the lot in 1911. He testified, as well as others witnesses, that prior to his purchase there had been a fence around some portion of the lot. The testimony is vague and uncertain. There may have been a fence around all of the lot at one time or another, but we do not find any evidence given by any witnesses that the lot was entirely fenced at any one time. Some of the witnesses say that there was a fence on one side and others say there was a fence on another side. It is admitted by all that the fence disappeared. After Mr. Kash purchased it he appears to have made some effort to inclose it, but he admits in the deposition which he gave before his death that the fence which he undertook to maintain around the lot disappeared in some way unknown to him. There was no building of any kind on the lot prior to 1919, when the "hot dog" stand known as the "Tin House" was built under the direction of Mr. Kash. In 1921 Chestnut clandestinely erected a small brick building on the lot. Thereafter the appellant, when one of his tenants was moving out, captured the building from him and there held possession of it and secured an injunction against him to prevent his interfering with her right of occupancy. Possession which will ripen into a title at the expiration of 15 years is something different from occasional trespasses, or the occasional exercise of ownership over the land. The payment of taxes or street improve-

ments or the using of a lot or parcel of ground as a pasture is not sufficient to constitute that character of possession which will eventually ripen into a title. Possession which will ripen into a title must be open so that every one who has any interest in the property may know that possession is held. Another way of stating it is that it must be notorious. Open and notorious possession will not ripen into a title unless it has been peaceable. It must not be held by force or threats. A more important element is that it must be continuous. There must be no break in the possession. It must be such that if the owner of the property should desire to institute suit against him who holds possession he might do so at any time during the period required for possession to ripen into a title. The abandonment of possession for any period of time however brief interrupts the continuity and the statute of limitations commences to run from the time of the break, if he who is seeking to obtain title by adverse possession again enters on the property. Measured by these standards, the appellant cannot have her claim upheld that her possession has tolled the right of entry of the record title holders.

It is insisted, however, that S. H. Kash was in the possession of the land when it was purchased by appellees. The purchase was at a judicial sale, and counsel for appellees say that the law of champerty does not apply when the purchase is at a judicial sale. But, be that as it may, an examination of the evidence on this point is not convincing that Mr. Kash was in the possession of the property, at the time appellees acquired their title, to such an extent as would enable him to rely upon the law of champerty. The setting up of a "hot dog" stand on a lot and allowing its use could hardly be called possession, without showing that the lot was inclosed and had been reduced to the complete dominion of the claimant.

It is insisted by appellant that appellees have not shown good paper title to the lot even conceding that it is within their boundary. It is insisted that they did not legally acquire the interest of W. R. Ramsey in the Corbin Town Company. We find little merit in that contention. Ramsey had become insolvent, and his creditors had sought to subject his stock in the Corbin Town Company to the payment of their demands. Through equitable proceedings the court rendered judgment against Ram-

sey, and his stock in the company was sold and purchased by appellees. It appears that this was in 1916 before the expiration of the charter of the corporation. The sale was not confirmed until after the expiration of the charter. It is insisted that the title to the stock did not pass until the confirmation of the sale, and, as the charter of the corporation had expired at that time, appellees took nothing by the confirmation of the sale. A corporation does not cease to exist simply because its charter expires. It has an existence beyond the life of its charter for the purpose of winding up its affairs. We are not certain, from an examination of the record, whether appellees acquired the interest of Ramsey in the land belonging to the company after the expiration of the charter through some of the numerous suits against Ramsey, or whether they acquired his interest in the land through their purchase of his stock. The land was sold at a judicial sale and purchased by appellees, but we do not think that appellees must rely solely on the regularity of that proceeding. They had purchased the stock of Ramsey before the expiration of the charter of the corporation. When the sale was confirmed it related back to the date of the purchase. As said before, the weight of authority is that upon the dissolution of a business corporation its property vests in the stockholders subject to the payment of corporate liabilities. This was so held in the recent case of Shadoin v. Sellars et al., 223 Ky. 751, 4 S. W. (2d) 717, wherein a number of authorities are cited to support that conclusion. If the appellees were the owners of the stock the title to the interest of Ramsey passed to them upon the dissolution of the corporation.

There is one other question for determination. That is a question of rents. The chancellor awarded appellees a judgment for $1,100 for rents for the detention of the property. The evidence as to the rental value of the property is not satisfactory. There is some proof that the "hot dog" stand was rented for $5 a month, and there is some proof that the clandestinely erected house had a rental value of $25 per month, but there is proof lacking which shows substantially the reasonable rental value of that lot or the damage caused by the detention thereof. We will not lengthen this opinion by reciting the evidence on this point. While we defer largely to the judgment of the chancellor in such matters, yet, when the proof is before us, as in this case, this court will exercise

an independent judgment as to whether the findings of the chancellor are supported by the evidence. We cannot say from the evidence what the judgment of the chancellor should have been on this point, but we are convinced that it awarded a sum as rents which was too large.

There is some proof in the record that S. H. Kash or appellant paid certain street assessments against the property. As to whether they did so or not we cannot clearly determine, and if we could there is no relief that could be given her as she has asked for none in her pleadings.

Upon a return of this case the court should refer it to his master commissioner to ascertain and make report from proof heard by him and submitted with his report as to the reasonable rental value of the lot in controversy during the time of its detention. At the same time, if appellant should choose to amend her pleadings and make claim for improvement taxes, or other taxes paid by her which should have been paid by the owners, the master commissioner should ascertain the amount so paid, if any, and the appellees should be held responsible to appellant for any sum so paid.

Judgment reversed, and cause remanded for proceedings consistent with this opinion.

Whole court sitting.