## Culton et al. v. Simpson et al.

(Decided June 19, 1936.)

J. R. LLEWELLYN for appellants.

A. T. W. MANNING and C. P. MOORE for appellees.

OPINION OF THE COURT BY DRURY, COMMISSIONER—
Reversing.

This litigation was begun in equity by Charley Culton et al. (hereinafter called the Culton heirs) against Alice Culton et al. for the sale of a 92¾ acre farm for the purpose of partition. Ham Simpson et al. (hereafter called the Edwards heirs) intervened and asserted the farm belonged to them. The cause was transferred to the common-law docket for a jury trial, and, at the conclusion of the evidence for Culton's heirs, the court directed a verdict for the Edwards heirs, and the Culton heirs have appealed.

### The Suit To Sell.

In their suit filed May 23, 1934, to sell this land for partition, Culton's heirs described themselves as the heirs of David M. Culton, who died intestate in 1893 leaving six children, whom they name,. and that of these two have since died intestate and have left children and these they name. All those who would inherit from David M. Culton are made parties, and the aliquot share of each is set out.

They describe by metes and bounds 92¾ acres of land on Flat Lick creek in Jackson county, which they allege David M. Culton owned at his death. They allege this land cannot be divided without impairing the value of each share therein, and make this further allegation:

> "Plaintiffs allege that they have been unable to find the original deed to their father and ancestor David M. Culton for said tract of land, and believe same to be lost, but they further allege that they and those under and through whom they claim title to said tract of land including their said father David M. Culton have by themselves, their tenants and agents been in the actual, peaceable, quiet, exclusive, continuous, uninterrupted, adverse possession of said

tract of land for more than fifteen years before the bringing of this action, holding, claiming and occupying same to a well marked and plainly defined boundary adversely to all the world.''

## The Interveners.

On January 4, 1935, Ham Simpson and others, describing themselves as the heirs of Dr. George G. Edwards, were permitted to file an intervening petition and counterclaim in which they say:

"That George G. Edwards departed this life intestate, domiciled in Jackson County, Kentucky, more than fifty years ago, the owner of, having the fee simple title to and in the actual possession of all of the boundary of land set up and described in the plaintiff's petition.''

They nowhere allege how Dr. Edwards became the owner of this land or when, and file no title papers. During the examination of Judge J. D. Spurlock, who had surveyed this land for the Culton heirs about 1902 or '03, he was presented with the calls of a deed from S. C. Collier to G. G. Edwards and asked if that was the description of the land he surveyed and he said it was. Thus we find a description of this land is in this record.

## The Evidence.

Because some of the determinative facts occurred more than a half century ago, the evidence regarding them cannot be very satisfactory, and this record presents difficulties comparable to our boyhood difficulties in tracking a rabbit in thin snow.

The widow of David M. Culton is still living, and she testified he bought this land many years ago at a tax sale and he had a tax title, but that was not produced. She did not know what became of it; she did not undertake to testify regarding its terms or even that she knew them. She testified she and her husband moved on to this Edwards farm under that tax title after he had rented it out for a few years.

Tax receipts were produced showing D. M. Culton paid $6 in taxes in 1884, and $7.35 in 1889, that Nancy Culton (his widow) paid $1.82 taxes in 1895 and $2.05 in 1898, and that her daughter Mollie Culton married W. P. Smith, and that he paid $5.13 taxes on this farm

in 1900 and $5.30 taxes in 1902. The evidence shows these taxes were paid on this Edwards farm.

When David M. Culton moved onto this farm is not clear. There is one hazy statement that he was living there in 1888, but definite evidence appears he was living there in 1891 and continued to live there until his death in 1893; that his widow and children continued to live there until 1899, when she remarried and went to live with her second husband, leaving her married daughter Mollie Smith and her husband on the place; that the Smiths lived there until 1903, during which year the place was rented to James Morris and the Smiths lived in London, Ky. The Smiths returned and lived there in 1904 and 1905; then they rented the place to Frank Fullington, who lived there in 1906, 1907, and 1908, and the Smiths lived in Hamilton, Ohio; then the Smiths returned and lived there in 1909, 1910, and 1911; then they rented the place to Charley Farmer, who lived there in 1912, and the Smiths lived in Clover Bottom; then the Smiths returned and lived there in 1913 and 1914. In 1915 the Smiths again moved to Hamilton, Ohio, and for a year or so the house was tenantless. About 1917 Frank Fullington, having been dispossessed where he was living, moved into the Culton house without leave or hindrance. Shortly thereafter the house was destroyed by fire. There was some evidence portions of the premises were rented for cultivation to Charley Simpson, Laura Peters, L. J. Robinson, Sherman Smith, William Hays, and others, and that, before he moved onto it, David M. Culton had rented it to a man named Roark, to William Evans and James Smith, but, disregarding those rentings, there was here evidence of continuous possession by David M. Culton, his widow, Nancy Culton, and his daughter Mollie Smith, and their tenants from 1891 to 1914. These possessions can be tacked together, and they cover 23 years. These possessions were actual, continuous, open, notorious, visible, exclusive, hostile, and under a claim of ownership. Thus they satisfy every element necessary to acquisition of title by adverse possession as set out in Flinn v. Blakeman, 254 Ky. 416, 71 S. W. (2d) 961, unless it be that of definiteness. An adverse possession must be definite.

### Was This Definite?

There was a two-story double log house on this property when David M. Culton came there. He built

an ell to the house, built a barn, impaled a curtilage, and fenced and cultivated something like 40 acres. How long these fences remained does not appear, but there is some evidence they went down after the house was burned.

To make an adverse possession definite, the adverse possessor must have either some color of title that will show the extent of his claim or a definite boundary often referred to as a well-marked line. The purpose of a color of title is to delimit and show the intention of the would-be adverse possessor. It is sometimes erroneously contended its purpose is to afford the true owner notice of the extent of the adverse claim, but that would require the color to be recorded, and in Krauth v. Hahn, 65 S. W. 18, 19, 23 Ky. Law Rep. 1261, we reversed a judgment because the court had given an instruction that contained the words: "Claim under a title of record." To same effect see Poage's Heirs v. Chinn's Heirs, 4 Dana (34 Ky.) 50, and 2 C. J. p. 181, sec. 348, and 1 R. C. L. p. 714, sec. 27. This tax title, if it had been produced or established, though not recorded, might have served as color of title, but under this evidence it must be held the Culton heirs failed to establish any color of title, so they must fall back to their well-marked line, if they had one.

## Did They Have a Definite Line?

The adverse possession that affects the rights of the true title owner is what exists and appears on the land itself. Adverse possession consists of outward acts and inward intention. It has often been written that the intention guides the entry and fixes its character and extent. The would-be adverse possessor must intend to claim to take and to hold the coveted property as his own. We have no other means of knowing the intent of the would-be adverse possessor, except as we ascertain that by observing his acts. He himself can only establish his intent by his acts or the color under which he entered. He may intend to seize 5 acres or he may intend to seize 500. We learn what he intends to do by looking at what he does. If he enters under a color of title, that shows what he intends to seize. If he enters without color, then he must give some indication of the extent of his intended seizure, he must have a marked line to indicate the extent of his claim, and many states quite logically hold that, since no one else can know his intention,

he must himself mark this line, but 2 C. J. 232, sec. 499, says this:

"In Kentucky, while the general rule is recognized, the courts of that state have placed an important limitation on its operation. Briefly stated it is this: One who without color of title enters on land having well defined boundaries marked on it, or which he himself marks thereon, and who occupies and uses a part, claiming the whole, acquires possession, co-extensive with the bounadries, unless some part is in the actual possession of another, or there is conflict as to the boundary with another which is older or superior and the owner of the latter has entered on the boundary."

Cases where this court has permitted an adverse possessor to claim to lines already marked by another before the adverse possessor entered are: Taylor v. Buckner, 2 A. K. Marsh. (9 Ky.) 18, 12 Am. Dec. 354, where Buckner was permitted to claim to the boundary of the Stephens patent, and New Domain Oil & Gas Co. v. Gaffney Oil Co., 134 Ky. 792, 121 S. W. 699, where we sustained an adverse possession by Henderson Foust of boundaries marked for Tom Smith and Irwin Miller. While the would-be adverse possessor without color may claim to a boundary marked by another as well as to one marked by himself, he would have this advantage in the latter instance, his own act in marking the line would indicate his intention, and in the former instance he would have to show intent to claim to the line marked by another. In either case there must be a definite line, to which he must claim.

Judge Spurlock testified he knew this David M. Culton tract of land and of his living on it; that on two occasions he had a sawmill on it; that he surveyed it about 1902 at the instance of the Smiths; and that he ran the calls taken from a deed from S. C. Collier to G. G. Edwards. Those calls are inserted in his testimony and are the same calls embraced in the petition in this case. Judge Spurlock testified he found marked trees, along the old Allen line, where it ran through the woods, and that other lines ran through cleared land, and the timber was gone; he testified to one corner, a chestnut and white oak, where he found one of the trees gone; that there was no question that the calls covered that land; and that Mollie Smith and William P. Smith were

then living on this land. He said it would have been hard to find the lines without a compass. He testified anybody could have found the Allen line. We know from an examination of these calls that this land abuts on the Allen line on the east for 132 poles, and that on the west it abuts on Flat Lick creek for about 200 poles, and the metes and bounds of the Edwards survey were run as Spurlock testifies and it closed. This shows there was evidence to indicate the Edwards survey is a very definite tract of land, and our next question is, Did the Culton heirs connect themselves with the Edwards survey?

Mrs. Culton offered to testify that, after David M. Culton bought this land at a tax sale, he wrote the owners and advised them of the sale and to come and redeem it if they desired to do so. So far there appears no reason for not admitting this testimony. Of course, further inquiry might have shown it to be inadmissible, but just as it is, Mrs. Culton might have learned this from herself reading and posting this letter. She testified Dr. Edwards' widow answered that Mr. Culton could go ahead and take the place and do what he pleased with it, that she never expected to be back any more.

Clearly the pronoun ''it'' in this last sentence refers to the Edwards farm, which we have shown above. There is evidence that it is a very definite tract of land, with a definite boundary inclosed by lines, the courses and distances of which are given. Mrs. Culton then testified she and her husband moved onto it under his tax title. Clearly by the use of this ''it'' she was referring to the Edwards farm. Throughout this evidence this farm is referred to as ''it.'' How easy it would have been to have had this evidence show that all these ''its'' referred to the Edwards farm, but no one saw the necessity of that and it was never done. It is perfectly clear, however, that the witnesses were referring to the Edwards farm and that by ''it'' they meant the whole Edwards farm. It had become a definite agricultural unit. It was a farm upon which David M. Culton entered and that the Culton heirs are now claiming. From that day to this there is no evidence the Cultons have claimed any less than the whole 92¾ acres; that any one ever occupied any part of it except under them; that any one ever claimed possession of any of it or disputed their title to any of it until the Edwards heirs did so by their in-

tervening petition in January, 1935, over 50 years after the Cultons began paying taxes upon it.

An adverse possession cannot be established by paying taxes upon the coveted property. Overton v. Overton, 123 Ky. 311, 96 S. W. 469, 29 Ky. Law Rep. 736; Kash v. Lewis, 224 Ky. 679, 6 S. W. (2d) 1098; Griffith Lumber Co. v. Kirk, 228 Ky. 310, 14 S. W. (2d) 1075. However, where one enters upon and begins to hold a definitely described piece of property and to pay taxes upon the whole of it, such payment of taxes on the whole is some evidence of an intention to seize and claim the whole.

The size of this property is not disproportionate to its use as a farm. It was not all cleared, and perhaps not all inclosed, but fifty years ago that was true of many farms in Kentucky. To acquire property by adverse possession, the would-be adverse possessor does not have to clear it or even fence it, but he must have a definite boundary to which he intends to claim, and he must have that when he enters. "He cannot move his boundary out year by year, and claim at the end of the statutory period all the land then within the boundary." Carson v. Turk, 146 Ky. 733, 143 S. W. 393, 394, 42 L. R. A. (N. S.) 384. We are persuaded that this which is taken from Murphy v. Doyle, 37 Minn. 113, 33 N. W. 220, 221, is both appropriate and sound:

"It is difficult to lay down a precise rule applicable to all cases, as much must depend upon the nature and situation of the property, and the uses to which it can be applied. For example, in the case of a farm, if the possession is open and notorious, comporting with the ordinary management of farms, it is not necessary that the whole farm be either improved or inclosed, at least where the unimproved part, as woodland, is subservient to and connected with that which is improved, and, for the same reason, the rule requiring actual and visible occupancy will be more strictly construed in an old and populous country, where land is usually improved and inclosed, than in a new country recently settled, in which the land is only partially improved. * * * An entry into possession of a tract under a deed containing specific metes and bounds gives constructive possession of the whole tract if not in any adverse possession, although there be no fence or in-

closure round the ambit of it. Of course, the proposition is subject to the proviso that the premises described in the conveyance consists of a single tract of a proper size to be managed and used in one body according to the usual manner of business of the country."

There was evidence some 35 or 40 acres of this farm was inclosed by a fence, and certainly as to that there was definite possession. This evidence shows this adverse possession began in 1891 and that it continued until 1915 without interruption. If we are right in that, and we are sure we are, then any interruptions after 1906 amount to nothing, for there had then been 15 years of adverse possession and the bar had fallen. After the bar falls, the adverse possessor is often said to have a perfect title. The true title holder cannot then molest him. The adverse possessor can then allow the property to be vacant and do just as he pleases, and his title will not be affected unless some one moves onto the property and initiates an adverse possession against him.

The evidence regarding this tract of land from 1917 or 1918 up to the filing of this suit in 1934 practically amounts to nothing. It may be some one else has entered since then and maintained such occupancy and possession as to have barred the claim of the Culton heirs, but that is a matter that must be developed by further evidence. Just now, with the evidence as it is, the possession and the right to possession appear to be in the Culton heirs.

Of course, the full development of the evidence in this case may overthrow all of this, but the court directed a verdict for the Edwards heirs at the close of the evidence for the Culton heirs, which was erroneous, for certainly the Culton heirs had put in enough evidence to entitle them to have their cause submitted to a jury.

Judgment reversed.

The whole court sitting; Judge Clay, C. J., dissenting on the ground that the evidence fails to show that the Cultons ever claimed the land to a well-defined or well-marked boundary.