RENDERED: MARCH 21, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-0534-MR

SAMMIE ALLAN DYKES                                              APPELLANT

v.

APPEAL FROM PULASKI CIRCUIT COURT
HONORABLE EDDY MONTGOMERY, JUDGE
ACTION NO. 18-CI-01035

CLOYD JEFFREY BUMGARDNER                                        APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CETRULO, LAMBERT, AND TAYLOR, JUDGES.

CETRULO, JUDGE: Sammie Allan Dykes ("Dykes") appeals a Pulaski Circuit Court judgment finding that Cloyd Jeffrey Bumgardner ("Cloyd J.") adversely possessed approximately 4.9 acres of his property. After careful review of the record and applicable law, we affirm.

# BACKGROUND

In 1998, Cloyd O. Bumgardner ("Cloyd O.") and Lois Bumgardner ("Lois") purchased approximately 70.69 acres of land in Pulaski County, Kentucky. That same year, Cloyd O. and Lois hired a surveyor to survey their property ("First Survey"). In 1999, Cloyd O. and Lois divided the land in half and conveyed 35.53 acres to their son, Cloyd J., and the remainder to their daughter, Tamara Bumgardner ("Tamara"). Approximately 4.9 acres of Cloyd J.'s property is the subject of this litigation (the "disputed property").

Dykes has lived on property adjacent to Cloyd J.'s since 1996. He lived on the property pursuant to a land contract, until he acquired the deed to it in 2006. Dykes's property is approximately 107 acres, 4.9 of which are the disputed property. He testified that his home is approximately one-half to three-fourths of a mile from the disputed property.

At trial, Cloyd J. testified that his parents cleared out an old logging road, a portion of which runs through the disputed property. He also testified that his father, Cloyd O., participated in a United States Department of Agriculture ("USDA") program for land improvement, and through that program received payments for clearing undergrowth from the disputed property from 2000 to 2001.

Cloyd O. and Lois had also constructed a distinct tree stand on the disputed property. Pictures and trial testimony – from Cloyd J., Lois, and

Tamara – verify the tree stand has a concrete foundation which is approximately 3x3x3 feet. The concrete foundation has the initials "CB" and the year "1999" carved into it. A steel I-beam runs from the foundation to a large (estimated between 8x8 feet and 10x10 feet) building. The building is made of 2x4s, sheets of heavy plywood, layers of tar paper for waterproofing, and residential shingles covering the roof. A welded ladder leads from the concrete foundation to a door in the bottom of the building, which is secured by a lock requiring a key for access. A picture of the building shows the windows are covered, and Dykes testified that the material covering the windows is burlap. Inside the building, hash marks and the years 1999, 2000, 2001, and 2004 are carved into a piece of wood, which apparently denote years in which Cloyd O. killed deer from the structure. The parties dispute the value of the structure, with estimates ranging from $2,000 to $20,000.

Cloyd J. testified that, like his father, he hunts from the stand, and he keeps a salt block, trail camera, and a deer feeder with corn on the disputed property. He further testified he comes onto the disputed property weekly to check the feeder. He stated he put up a "no trespassing, no hunting" sign when he saw tracks, but he had never seen any person on their property. Additionally, he has planted grasses and trees, and hunted ginseng on the disputed property. Cloyd J. was unaware that Dykes claimed ownership of the disputed property until 2018.

Dykes admitted he knew of the property dispute since 1998. At trial, he testified that he and Cloyd O. spoke about the dispute and agreed Cloyd O. could build the structure on the disputed property if he allowed Dykes to access and utilize the structure. Cloyd O. died in 2012, so he could not confirm or deny the existence of that agreement. Further, the living Bumgardner family members – Cloyd J., Lois, and Tamara – and Dykes all agreed they had never met or even seen each other on the disputed property or otherwise. Dykes did confirm he had seen some no trespassing signs on the land at some point.

Dykes claimed to have a key to the structure, but he did not produce it at trial. Contrary to the Bumgardners, he stated that the door is no longer locked. He further stated he has hunted from the structure, ridden four wheelers and horses on the disputed property, and his wife used to hike ten miles a day on the land. He produced no pictures or hunting records, and his wife did not testify. Dykes's cousin also testified he had hunted from the structure for years with permission from Dykes and it was never locked.

In 2017 or 2018, Dykes obtained a survey of his land ("Second Survey"). This survey overlapped with the First Survey and showed that the disputed land was within Dykes's property. Subsequently, Dykes removed Cloyd J.'s deer feeder and salt block from the disputed property and left a note stating, "I HAVE YOUR FEEDER AND SALT BLOCK. YOU CAN CALL [phone

number] to get them back, Dykes." In response, Cloyd J. obtained counsel and sent a demand letter to Dykes that accused him of stealing. Dykes responded by filing suit to quiet title in 2018. Cloyd J. answered and counterclaimed. In his pleading, Cloyd J. claimed to be the title owner of the disputed property or, in the alternative, to have acquired ownership of the disputed property through adverse possession.

The circuit court held a bench trial on March 4, 2024. Dykes moved for a directed verdict twice at trial but was denied each time. The circuit court reserved its judgment until Dykes produced his surveyor's deposition. On April 8, 2024, the circuit court entered its judgment finding the Second Survey in favor of Dykes established the correct boundary line, but that Cloyd J. adversely possessed the disputed property. Dykes appealed that judgment.

**STANDARD OF REVIEW**

Following a bench trial, we review a circuit court's factual findings for clear error. *Bishop v. Brock*, 610 S.W.3d 347, 350 (Ky. App. 2020) (citing Kentucky Rule of Civil Procedure ("CR") 52.01). "Factual findings are clearly erroneous if unsupported by substantial evidence." *Id.* (citing *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003)). Evidence is substantial "when taken alone or in light of all the evidence, [it] has sufficient probative value to induce conviction in the mind of a reasonable person." *Id.* (internal quotation marks omitted) (quoting

*Bowling v. Nat. Res. & Env't Prot. Cabinet*, 891 S.W.2d 406, 409 (Ky. App. 1994)). Because the circuit court "had the opportunity to observe, scrutinize, and assess the credibility of witnesses[,]" we give a high degree of deference to its factual findings. *Id.* (citing CR 52.01). We review the circuit court's legal conclusions *de novo*. *Id.* (citing *Hoskins v. Beatty*, 343 S.W.3d 639, 641 (Ky. App. 2011)).

### ANALYSIS

Dykes argues the circuit court erred because Cloyd J. failed to prove the elements of adverse possession by clear and convincing evidence. Additionally, Dykes argues the circuit court erred when it denied his two motions for directed verdict and found that the recreational use statute, Kentucky Revised Statute ("KRS") 411.190, did not apply to the case.[1]

Conversely, Cloyd J. argues he proved the elements of adverse possession and KRS 411.190 does not apply because his actions went beyond mere recreational use. We agree.

---

[1] Dykes also argues the circuit court erred when it denied his motions for a directed verdict on the issue of adverse possession. When reviewing the denial of a directed verdict "we must ascribe to the evidence all reasonable inferences and deductions which support the claim of the prevailing party. . . . In the end, a trial court should only grant a directed verdict when there is a complete absence of proof on a material issue or if no disputed issues of fact exist upon which reasonable minds could differ." *Toler v Süd-Chemie, Inc.*, 458 S.W.3d 276, 285 (Ky. 2014) (internal quotation marks and citations omitted). Consequently, if we find the circuit court did not err on Dykes's first assignment of error, then his directed verdict argument necessarily fails as well. Because we are affirming the circuit court's judgment, we will not further address this duplicative argument.

To succeed on a claim for adverse possession, the claimant must establish five elements through clear and convincing evidence: "1) possession must be hostile and under a claim of right[;] 2) it must be actual[;] 3) it must be exclusive[;] 4) it must be continuous[;] and 5) it must be open and notorious." *Bishop*, 610 S.W.3d at 350 (internal quotation marks and citations omitted). To satisfy the continuous element, an adverse possession claim "may be brought only within fifteen (15) years after the right to institute it first accrued to the plaintiff, or to the person through whom he claims." KRS 413.010. "One in the actual adverse possession of a portion of land under a deed is in adverse possession of the entire tract described in the deed; while one in adverse possession without color of title must indicate the extent of his claim by well-defined boundaries." *Appalachian Regional Healthcare, Inc. v. Royal Crown Bottling Co., Inc.*, 824 S.W.2d 878, 880 (Ky. 1992) (citing *Shepherd v. Morgan*, 246 S.W.2d 131, 132 (Ky. 1951)).

The circuit court found that Cloyd J. proved the elements of adverse possession by clear and convincing evidence. The court held Cloyd J. and his predecessors in title (his parents) acted on belief that their survey established a property line that included the disputed 4.9 acres of land. The court found the Bumgardner family openly exercised control over – *i.e.*, actually possessed – the disputed property by building and maintaining a permanent structure on it, planting trees on it, and planting grasses on it. Further, the circuit court stated that Dykes,

who lived a half mile from the tree stand, would know that the Bumgardner family exercised open and hostile control over the disputed property, as they were treating it as their own. Additionally, Cloyd J. demonstrated that possession of the disputed property was exclusive because his testimony, as well as that of Lois and Tamara, was that the tree stand remained locked.

The circuit court concluded that Cloyd J.'s possession was hostile under a claim of right and went unchallenged for over 15 years, the statutory period. Dykes did not bother to have his property surveyed until 2017, although he claimed to have knowledge of the tree stand and claimed he discussed the property dispute with Cloyd O. in 1998. In the meantime, the circuit court noted the Bumgardner family did everything an owner would do on its property, including maintaining it, traversing it, engaging in contracts with the USDA to remove vegetation/trees on it, building structures on it, and planting trees on it within eyesight of Dykes's property.

The circuit court found the evidence did not support Dykes's testimony and found his cousin's testimony unbelievable. Dykes himself testified he knew the Bumgardner family used the property, but insisted he had given Cloyd O. permission to do so. The circuit court disagreed and found Dykes understood the Bumgardner family built a structure on the disputed property and exercised dominion over the property, as would a true owner.

Finally, the circuit court concluded the Second Survey clearly delineated the boundary line of the property adversely possessed by Cloyd J. However, Dykes continues to argue that lack of a clear boundary line, which he maintains must be evinced by a fence or something of the like, defeats Cloyd J.'s adverse possession claim over the entire 4.9 acres.

Dykes's argument fails because an "adverse possessor must have *either* some color of title that will show the extent of the claim *or* there must be a definite boundary." *Appalachian Reg'l Healthcare, Inc.*, 824 S.W. 2d at 880 (citing *Culton v. Simpson*, 96 S.W.2d 856 (Ky. 1936)) (emphases added). Here, Cloyd J.'s deed, the First Survey, and the Second Survey all indicate the boundary line of the disputed property.[2] The circuit court viewed all these documents at trial and referenced them in its detailed findings of fact, conclusions of law, and judgment. Even though the circuit court ultimately found that Cloyd J.'s deed was defective, "any instrument that purports to convey land and shows the extent of the grantee's claim may afford color of title." *See id.* (citing *McDaniel v. Ramsey's Adm'rs*, 204 S.W.2d 953 (Ky. 1947)). "Thus[,] even a deed that is defective or invalid is sufficient to afford color of title." *Id.* Accordingly, Cloyd J. did not need to establish a well-defined boundary line because he had some color of title

---

[2] Additionally, each of the three documents describes the same yellow tipped iron pin that sits at the edge of the disputed property closest to Dykes's land.

and was only granted adverse possession of property described through the documents bestowing that color of title.

The circuit court rendered its judgment after consideration of the substantial evidence – pictures, surveys, deeds, and testimony – before it. Dykes is essentially asking us to find that the circuit court erred because he believes the evidence supporting his position is more credible than the evidence supporting that of Cloyd J. Because we give a high degree of deference to the court's factual findings, we will not weigh the evidence in Dykes's favor now. *See Bishop*, 610 S.W.3d at 350 (citing CR 52.01). The circuit court based its factual findings on substantial evidence, and that evidence was clear and convincing enough to satisfy the legal elements of adverse possession and support the court's judgment. *See id.* Accordingly, the court properly found Cloyd J. established ownership of the disputed property by adverse possession.

Lastly, Dykes argues the circuit court should have applied KRS 411.190(8) to bar Cloyd J.'s claim of adverse possession. Whether KRS 411.190 applies to Cloyd J.'s claim is a question of law that we review *de novo*; however we defer to the circuit court's factual findings within our *de novo* analysis unless those findings are clearly erroneous. *See Bishop*, 610 S.W.3d at 350. As we have just determined, the circuit court's factual findings were not clearly erroneous.

KRS 411.190(8) states that "[n]o action for the recovery of real property, including establishment of prescriptive easement, right-of-way, or adverse possession, may be brought by any person whose claim is based on use *solely* for recreational purposes." (emphasis added). KRS 411.190(1)(c) states that a "'[r]ecreational purpose' includes, but is not limited to, . . . hunting[.]" Therefore, Dykes argued the statute bars the adverse possession claim of Cloyd J. because his use of the disputed property mainly involved hunting.

The circuit court disagreed and noted that "[t]he purpose of [KRS 411.190] is to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting their liability toward persons entering thereon for such purposes." KRS 411.190(2). At trial, the circuit court stated this case is about more than the recreational use statute, and "the Bumgardners bought the property, they thought they owned the property, [and] they acted in a manner as such." We agree.

KRS 411.190(8) was codified to clarify "that recreational use does not amount to 'actual' possession." *Moore v. Stills*, 307 S.W.3d 71, 80 (Ky. 2010).

> [T]he acts necessary to reduce property to actual possession will depend to some extent on the character of the property, its physical nature, and the use to which it has been put[,] . . . however, that does not mean that wild and uncultivated lands may be reduced to actual possession by any use whatsoever. The use must still be so substantial as to put the owner on notice that his or her dominion over the land is being usurped. Recreational

-11-

uses, which do not alter the character of the land and so leave the owner's potential uses undisturbed, do not suffice.

*Id*. at 79; *see also Vick v. Elliot*, 422 S.W.3d 277 (Ky. App. 2013) (holding that erection of a fence amounted to actual possession and went beyond the mere recreational use contemplated by KRS 411.190(8)).

While Cloyd J.'s use of the property did encompass some recreational purposes, those purposes were not the *sole* basis of his claim. The erection of the tree stand, a large structure supported by a steel I-beam with a concrete foundation, goes beyond the recreational use contemplated by KRS 411.190(8). The structure, which has continuously stood since 1999, was and is "so substantial as to put [Dykes] on notice that his . . . dominion over the land [was] being usurped." *See Moore*, 307 S.W.3d at 80. Furthermore, the structure "alter[ed] the character of the land" and disturbed Dykes's potential uses of it. *See id*. Dykes himself admits to knowledge of the structure and notice of the land dispute dating back to the late 1990s. Therefore, Cloyd J. actually possessed the disputed land, his claim went beyond the recreational use statute, and the circuit court did not err.[3]

---

[3] Because the substantiality of the structure and Dykes's admitted notice of the structure/land dispute move Cloyd J.'s adverse possession claim beyond the confines of KRS 411.190(8), we do not need to address whether Cloyd J.'s other activities were merely recreational use of the land or uses that amounted to his actual possession of the disputed land.

**CONCLUSION**

Accordingly, we AFFIRM the judgment of the Pulaski Circuit Court.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Heidi Weatherly
Mt. Vernon, Kentucky

BRIEF FOR APPELLEE:

William M. Thompson, III
Somerset, Kentucky